Richard WINTERS, Petitioner,

v.

**HOUSTON CHRONICLE PUBLISHING COMPANY, Respondent.**

No. C–9468.

Supreme Court of Texas.

Sept. 6, 1990.

James W. Holtz, Houston, for petitioner.

William W. Ogden, James R. Snell, Valerie Eiben Strauss, Houston, for respondent.

OPINION

GONZALEZ, Justice.

This is an appeal from a summary judgment in a wrongful discharge suit. Richard Winters brought this action against his former employer, Houston Chronicle Publishing Company, alleging that he was fired for reporting illegal activities of his fellow employees to upper-level management. The trial court rendered summary judgment against Winters on the basis that his pleadings failed to state a cause of action. The court of appeals affirmed. 781 S.W.2d 408. We affirm the judgment of the court of appeals.

Winters worked as an at will employee for the Chronicle from April 1977 to June 1986. During his tenure with the Chronicle, Winters worked in at least seven departments. Winters asserts that beginning in 1980, he became aware of alleged illegal activities on the part of fellow employees. He claims that the Chronicle was falsely reporting an inflated number of paid subscribers, that several employees were engaged in inventory theft, and that his immediate supervisor offered him an opportunity to participate in a kickback scheme with the manufacturers of plastic bags. Winters orally reported all of these activities to upper-level management in January 1986 but did not make any oral or written report to law enforcement authorities. He was terminated six months later. He alleges that the sole cause for his termination was his report to management of the suspected illegal activities. Winters asserts that the reported conduct "may" violate Texas Penal Code section 32.42(b)(12)(A) governing criminal deceptive trade practices. Winters further contends that the offer to participate in a kickback scheme "purportedly" violates sections 15.01 and 31.03 of the Texas Penal Code dealing with criminal attempt and theft. We must determine whether, under these facts, he has stated a cause of action.

■ The long standing rule in Texas is that employment for an indefinite term may be terminated at will and without cause. *East Line & R.R. Co. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888). To date,

this court has created only two exceptions. In *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985), we recognized a narrow exception for an employee discharged "for the sole reason that the employee refused to perform an illegal act." Winters does not fit within the *Sabine Pilot* exception because he was not unacceptably forced to choose between risking criminal liability or being discharged from his livelihood. We have also recognized another exception for an employee who demonstrates that the principal reason for discharge was the employer's desire to avoid contributing or paying benefits under the employer's pension fund. *McClendon v. Ingersoll–Rand Co.,* 779 S.W.2d 69, 71 (Tex.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 1804, 108 L.Ed.2d 935 (1990).

The legislature has also placed restrictions upon the at will employment doctrine. In protecting employees who report illegal activities in the workplace, the legislature has enacted protection for a limited class of employees. Public employees are protected from retaliation for reporting, in good faith, violations of law to an appropriate law enforcement agency. Tex.Rev.Civ. Stat.Ann. art. 6252–16a (Vernon Supp. 1990). Certain private sector employees are also protected. A nursing home employee has a cause of action against the institution or its owner if he or she is terminated for reporting abuse or neglect of a resident of the institution. Tex. Health & Safety Code Ann. § 242.133 (Vernon Supp.1990). An employer who uses hazardous chemicals may not discharge an employee who reports a violation of the Hazard Communication Act. Tex. Health & Safety Code Ann. § 502.013 (Vernon 1990). Finally, an employer cannot retaliate against an employee for reporting violations of the Commission on Human Rights Act. Tex.Rev.Civ.Stat.Ann. art. 5221k § 5.05 (Vernon 1989).[1]

■ Winters admits that he does not come within any of the statutory or common law exceptions to the at will doctrine. He is asking this court to recognize a cause of action for private employees who are discharged for reporting illegal activities.[2]

---

1. Numerous other restrictions and exceptions to the at will doctrine have been created by the legislature. *See, e.g.,* Tex.Rev.Civ.Stat.Ann. art. 8307c (Vernon Supp.1990) (prohibiting discharge for filing a workers' compensation claim); Tex.Rev.Civ.Stat.Ann. 5207a (Vernon 1987) (prohibiting discharge based on union membership or nonmembership); Tex.Gov't Code Ann. § 431.006 (Vernon 1990) (prohibiting discharge because of active duty in the state military forces); Tex.Civ.Prac. & Rem.Code § 122.001 (Vernon 1986) (prohibiting discharge because of jury service); Tex.Rev.Civ.Stat.Ann. art. 5221k (Vernon Supp.1990) (prohibiting discharge based on race, color, handicap, religion, national origin, age, or sex); Tex.Fam.Code Ann. § 14.43(m) (Vernon Supp.1990) (prohibiting discharge due to withholding order for child support); Tex.Rev.Civ.Stat.Ann. art. 5547–300, § 9 (Vernon Supp.1990) (mentally retarded people cannot be denied equal employment opportunities); Tex.Elec.Code Ann. § 276.004 (Vernon 1986) (employers subject to criminal liability for not allowing employees time off to vote); Tex.Elec.Code Ann. § 276.001(a)(2) (Vernon 1986) (employer commits felony by trying to coerce employee to vote a certain way); Tex. Elec.Code Ann. § 161.007 (Vernon 1986) (employer subject to criminal liability if he refuses employee's rights to attend political convention); Tex.Rev.Civ.Stat.Ann. art. 5196g (Vernon 1987) (employer subject to fine for coercing employee to buy certain merchandise); Tex.

Health & Safety Code Ann. § 81.102 (Vernon 1990) (employer generally cannot require test for AIDS virus).

2. Winters initially asked that a duty of good faith and fair dealing be implied into all at will employee relationships but abandoned this request at oral argument. Numerous other courts have explicitly refused to imply a duty of good faith into employment at will contracts, generally on the premise that to do so would create too great an intrusion into the employment relationship or would import a duty to terminate only for cause. *See, e.g., Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625 (1982); *Hugo v. Tomaszewski,* 155 Ill.App.3d 906, 108 Ill.Dec. 562, 508 N.E.2d 1139 (1987); *Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 738 P.2d 841 (1987); *Hunt v. Mid. American Employee's Federal Credit Union,* 384 N.W.2d 853 (Minn.1986); *Neighbors v. Kirksville College,* 694 S.W.2d 822 (Mo.Ct.App.1985); *Hillesland v. Federal Land Bank Ass'n of Grand Forks,* 407 N.W.2d 206 (N.D.1987); *Breen v. Dakota Gear & Joint Co.,* 433 N.W.2d 221 (S.D.1988); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984) (citing authority from New York and Arizona); *Brockemeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983); *Chasson v. Community Action of Laramie County, Inc.,* 768 P.2d 572 (Wyo.1989). We recently declined an opportunity to imply such a duty into employ-

We decline to do so at this time on these facts.[3]

For the above reasons, the judgment of the court of appeals is affirmed.

Concurring opinion by DOGGETT, J., joined by RAY and MAUZY, JJ.

DOGGETT, Justice, concurring.

In *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985), this court afforded employees protection from retaliatory discharge for refusing to engage in illegal conduct. The central issue presented by this case is the availability of recourse to an employee not asked to participate directly in illegal conduct but instead to condone, by remaining silent, activities in the workplace that have a probable adverse effect upon the public.

Petitioner Richard Winters does not allege that his termination from employment was motivated by his having refused to perform an illegal act. Rather, he asserts his discharge resulted from his having brought to the attention of his supervisors conduct that he believed was fraudulent and illegal. In April 1977, Respondent Houston Chronicle Publishing Company hired Winters as a Division Manager in its Copy Sales Department. For three and one-half years, he worked in that capacity without incident. Beginning in October 1980, and continuing at various times until

February 1986, Winters alleges that he informed the Chronicle that some of its managerial employees engaged in circulation fraud, inventory theft, and a "kickback" scheme. Winters alleges that in June 1986, as a result of these reports, he was fired. The trial court rendered summary judgment against him on the basis that his pleading failed to state a cause of action under *Sabine Pilot;* the court of appeals affirmed.

By stating that it declines to recognize such a cause of action "at this time on these facts," at 725, the court leaves the clear implication that it will do so at a future time on other facts. This conclusion is strengthened by the court's reference to the many states that "protect private sector employees who report illegal activity in the workplace." At 725 n. 3. I very reluctantly concur with the court that this may not be the most appropriate case in which to announce an important new rule of law.

To offer guidance to both employers and employees, I write to define the elements of a cause of action for employees who suffer employer retaliation for exposing from within activities in the workplace that have a probable adverse effect upon the public. Because trial judges and courts of appeals will have the responsibility to enforce this cause of action under appropriate

ment contracts in *McClendon,* 779 S.W.2d at 70, n. 1.

**3.** Other jurisdictions, through legislative or judicial action, protect private sector employees who report illegal activity in the workplace. *See, e.g., Knight v. American Guard & Alert, Inc.,* 714 P.2d 788 (Alaska 1988); *Wagner v. City of Globe,* 150 Ariz. 82, 722 P.2d 250 (1986); *Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380 (1988); Cal.Lab.Code § 1102.5 (West 1989); *Garcia v. Rockwell Int'l Corp.,* 232 Cal. Rptr. 490, 187 Cal.App.3d 1556 (1986); Conn. Gen.Stat.Ann. § 31–51m (West Supp.1990); Haw.Rev.Stat. §§ 378–61—378–69 (1988); *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Palmer v. Brown,* 242 Kan. 893, 752 P.2d 685 (1988); *Brown v. Physicians Mut. Ins. Co.,* 679 S.W.2d 836 (Ky.Ct.App.1987); Me.Rev.Stat.Ann. tit. 26 §§ 831–839 (1988); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981); Mich. Comp.Laws §§ 15.361—.369 (West 1981); Minn.

Stat.Ann. §§ 181.931—.937 (West Supp.1990); Mont.Code Ann. §§ 39–2–901—914 (1989); *Schriner v. Meginnis Ford Co.,* 228 Neb. 85, 421 N.W.2d 755 (1988); *Wiltsie v. Baby Grand Corp.,* 774 P.2d 432 (Nev.1989); N.H.Rev.Stat.Ann. §§ 275: E1—E7 (Supp.1989); N.J.Rev.Stat.Ann. §§ 34:19–1—34:19–8; *Vigil v. Arzola,* 102 N.M. 682, 699 P.2d 613 (Ct.App.1983), *rev'd in part and remanded,* 101 N.M. 687, 687 P.2d 1038 (1984), *overruled in part, Chavez v. Manville Products Corp.,* 108 N.M. 643, 777 P.2d 371 (1989); N.Y.Lab.Law § 740 (McKinney 1988); Ohio Rev.Code Ann. § 4113.51—.53 (Baldwin 1989); *McQuary v. Bel Air Convalescent Home,* 69 Or.App. 107, 684 P.2d 21, *review denied,* 298 Or. 37, 688 P.2d 845 (1984); Public Chapter 771, Tenn.House Bill 2516 substituted for Senate Bill 1840 (Signed March 29, 1990); *Dicomes v. State,* 113 Wash.2d 612, 782 P.2d 1002 (1989); *Harless v. First Nat'l Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978); *see also* Larson and Borowsky, *Unjust Dismissal* (1989).

circumstances,[1] it is both necessary and desirable to give them direction to prevent the costly retrial of cases.

In creating such a cause of action, the judiciary must be mindful of our long adherence to the employment-at-will doctrine in Texas, recognizing the right of an employer to fire employees at any time with or without cause. *East Line & R.R.R. Co. v. Scott*, 72 Tex. 71, 10 S.W. 99 (1888). We must respect the need for employers to make difficult managerial decisions vital to the effective operation of a business organization without unnecessary judicial intrusion. This court has nonetheless been willing to carve out narrow exceptions when the employer's primary motivation for termination of employment directly contradicted important societal interests. Thus, in *Sabine Pilot* we refused to condone the firing of an employee if grounded upon a refusal to perform an illegal act even though such conduct might have produced a financial benefit to the employer.[2]

We have been urged to demonstrate judicial restraint by deferring employee protection exclusively to the legislature. Yet the absence of safeguards stems largely from this court's recognition of the at-will employment doctrine in *East Line* over a century ago. In carving out narrow exceptions to this rule, the court balances precariously between the need for stability and continuity in the law and the need to preserve the law's vitality and applicability in a changing society. Here, no societal interest can be advanced that would support an employer's retaliation against an employee who reported activities harmful to the public. In this situation, judicial failure to modify the law constitutes neither restraint nor neutrality, but rather an active participation in perpetuating injustice. This is particularly true when the judiciary can craft a narrow exception that protects the interests of responsible, law-abiding employers while holding accountable those whose activities threaten the public interest.[3]

The very case that Respondent urges as dispositive, *Maus v. National Living Centers, Inc.*, 633 S.W.2d 674 (Tex.App.—Austin 1982, writ ref'd n.r.e.), demonstrates the shocking result of a judicial refusal to protect workers who report injurious activities. A person described by that court as "a dedicated worker who often worked double shifts and took an active interest in the patients" was discharged, allegedly for complaining to her employer concerning the neglect and poor quality of care provided nursing home residents. *Id.* at 675. One of her complaints concerned the death of a patient for whom her employer allegedly refused to call a doctor. Moreover, she claimed her firing violated a "substantial, stated public policy" embodied in a statute providing criminal penalties for failure to report cases of abuse and neglect. *Id.* Not finding a specific legislative remedy for the dismissal, the court apparently viewed itself as incapable of altering a rule laid down a century before. Seven years and unknown numbers of dismissed employees or unreported observations of nursing home patient neglect later, the legislature finally adopted protection for such employees.[4]

1. *See Hauck v. Sabine Pilots, Inc.*, 672 S.W.2d 322, 323 (Tex.App.—Beaumont 1984) (duty of intermediate court to determine questions not specifically decided by this court), *aff'd sub. nom Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex.1985); *see also Johnston v. Del Mar Distrib. Co.*, 776 S.W.2d 768 (Tex.App.—Corpus Christi 1989, writ denied) (interpreting *Sabine Pilot* to apply to worker fired for inquiring whether acts employer directed her to perform are illegal).

2. *See also McClendon v. Ingersoll–Rand Co.*, 779 S.W.2d 69 (Tex.1989), *cert. granted*, —— U.S. ——, 110 S.Ct. 1804, 108 L.Ed.2d 935 (1990) (recognizing exception for dismissal motivated by the employer's desire to avoid paying pension benefits).

3. Concomitantly, this narrow exception should protect only honest employees who follow principles of integrity and social responsibility at the peril of unemployment, not the disgruntled worker who makes unfounded complaints against the employer's activities or acts out of less admirable motives such as spite. *See infra* note 20 and accompanying text.

4. Tex.Health and Safety Code Ann. § 242.133 (Vernon Supp.1990). Unfortunately, the statutory fabric of employee protection does not extend to most Texans. Consider, for example,

The judiciary should not ignore those unscrupulous employers who wield the powerful weapon of the pink slip to intimidate workers into silence in order to conceal and perpetuate activities in the workplace that endanger the public. Fortunately, this court has recognized that waiting for the legislature is not the only alternative available, as it is highly appropriate "to judicially amend a judicially created doctrine." *Sabine Pilot*, 687 S.W.2d at 735. Mindful of this responsibility, our courts must refine and modify this judicially created employment-at-will doctrine to prevent dismissal of those who seek, by internal or external report, to bring to a halt activities in the workplace that have a probable adverse effect upon the public.

As the court today recognizes, other states have not permitted legislative inaction to preclude a judicial response for these employees. In *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978), a cause of action was upheld for an employee who alleged that a retaliatory discharge had resulted from his efforts to prevent overcharging of customers for installment loan prepayments in violation of consumer credit and protection laws.[5] Similarly, the Kansas Supreme Court afforded a remedy to a woman who had been fired after reporting to authorities that a co-worker was committing Medicaid fraud by billing for services that had not been performed. *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685, 686 (1988). The same cause of action was approved in *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980), for a quality control director who contended he was discharged for calling to his employer's attention repeated violations of a state food and drug act. In *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981), an employee was fired after reporting possible criminal violations by a co-worker to local law enforcement authorities and agreeing to assist in any resulting investigation and trial. Noting the importance of "citizen crime-fighters," the Illinois Supreme Court quite appropriately declared that:

> The law is feeble indeed if it permits [an employer] to take matters into its own hands by retaliating against its employees who cooperate in enforcing the law.

*Id.* 52 Ill.Dec. at 17, 421 N.E.2d at 880.

This court has been asked to recognize a cause of action for "whistleblowers." The term is derived from the act of an English bobby blowing his whistle upon becoming aware of the commission of a crime to alert other law enforcement officers and the public within the zone of danger. *See Blowing the Whistle* 18 (C. Peters & T. Branch eds. 1972). Like this corner law enforcement official, the whistleblower sounds the alarm when wrongdoing occurs on his or her "beat," which is usually within a large organization.

While many contemporary definitions of the term have been advanced, no one definition captures the essence of a "whistleblower"—the public need and benefit, the conflict of loyalties to the employer and to the public good, and the corresponding personal anguish involved. One definition states that whistleblowing is "the act of a man or woman who, believing that the public interest overrides the interest of the organization he serves, publicly 'blows the whistle' if the organization is involved in corrupt, illegal, fraudulent, or harmful activity." *Whistle Blowing: The Report of the Conference on Professional Responsibility* vii (R. Nader, P. Petkas & K. Blackwell eds. 1972) [hereinafter *Report on Professional Responsibility*].[6] Another recognizes that:

> Employees who protest corporate wrongdoing are ... not invoking the whistle of

---

one who witnesses severe abuse of children by a co-worker at a child care center. If the employee is fired for reporting this conduct to a supervisor or outside law-enforcement agency, no protection has yet been recognized under our current statutory and common law.

**5.** This court recently relied on *Harless* in its most recent writing on the employment-at-will doctrine. *Ingersoll–Rand Co.*, 779 S.W.2d at 70.

**6.** *See also The Employee Termination Handbook* 27 (J. Allen ed. 1986) (report may be made either publicly or internally within the corporate structure).

authority but the whistle of desperation. Their action resembles that of a person who blows a whistle to bring help when threatened with assault on the city streets. The hope is that the law will arrive and protect not only the person's rights but the peace and good order of the community. In a society where the law operates well, the hope is also that just wearing the whistle on a street, or threatening to use it in the corporate setting, may serve to ward off misconduct.

*Whistleblowing! Loyalty and Dissent in the Corporation* 2 (A. Westin ed. 1981) [hereinafter *Loyalty and Dissent*]. A third focuses on the effect on those

> employees who believe their organization is engaged in illegal, dangerous, or unethical conduct. Usually, they try to have such conduct corrected through inside complaint, but if it is not, the employee turns to government authorities or the media and makes the charge public. Usually, whistle blowers get fired. Sometimes, they may be reinstated. Almost always, their experiences are traumatic, and their careers and lives are profoundly affected.

*Id.* at 1. Yet another emphasizes the importance of the role of the whistleblower in a democratic society dominated by large institutions:

> Whistleblowing is a formal or informal role that arises in and may even be essential to rule systems, for the whistleblower functions to generate information about violations in order that sanctions or feedback to shape human behavior can occur.... An institution that seriously intends to prevent ... misconduct needs to recognize that it is involved in applying rules to human behavior; the institution thus needs the services of the whistleblower to provide information necessary for its rules to be enforced.... If

the system of institutional rules is to work, the institution needs to utilize the whistleblower's services.

Robertson, "Commentary: Whistleblowing and the Role of the Federal Government," in *Whistleblowing in Biomedical Research* 159, 159–60 (J. Swazey & S. Scher eds. 1981) [hereinafter *Whistleblowing in Biomedical Research*].[7]

Often the very act of whistleblowing indicates that governmental regulation has been inadequate to protect the public; it "represents a breakdown of systems whose very goal is to make sure that misconduct does not occur in the first place." Nightingale, "Whistleblowing In Biomedical Research: The Role of the Food and Drug Administration," in *Whistleblowing in Biomedical Research, supra,* at 155; *see also* C. Stone, *Where the Law Ends: The Social Control of Corporate Behavior* 213 (1975) [hereinafter *Where The Law Ends*]. Thus, "[i]f the general welfare is to be protected, it will be protected by the actions of people, not the government." Testimony of Dr. A. Dale Console, former Research Director to E.R. Squibb Pharmaceutical Company, in M. Glazer & P. Glazer, *The Whistleblowers: Exposing Corruption in Government and Industry* vii (1989) [hereinafter *The Whistleblowers*]. Some business leaders acknowledge that the free enterprise system itself is a beneficiary of whistleblowing; a former president of the National Association of Manufacturers, Alexander B. Trowbridge, has stated that:

> The modern corporation must encourage the honest and concerned employee to blow the whistle on illegalities and actual malpractices. It must give the whistle blower access to the people who can change things. And it must protect him against recrimination.... [It must create] an atmosphere in which the individual, when confronted with something

---

7. *See also* Vaughn, *Statutory Protection of Whistleblowers in the Federal Executive Branch,* 1982 U.Ill.L.Rev. 615, 666 ("Whistleblower protection ... not only recognizes individual rights but also vindicates democratically developed standards imposing legal control."); Comment, *Protecting the Private Sector At Will Employee who "Blows the Whistle": A Cause of Action Based Upon Determinants of Public Policy,* 1977 Wisc.L.Rev. 777, 778–79 ("[T]he weight of opinion encourage[s] the whistle-blowing employee as a necessary element in the social control of organizations.").

clearly illegal, unethical or unjust, can feel free to speak up—and to bring the problem to the attention of those high enough up in the corporation to solve it. *Loyalty and Dissent, supra,* at 142.[8]

Employees are the first to learn of activities in the workplace that may have an adverse effect upon the public and are in the best position to bring to a halt threatening conduct before irreversible damage is done. *See Brown v. Texas A & M Univ.,* 804 F.2d 327, 337 (5th Cir.1986) (These individuals are "uniquely qualified to reveal unseemly machinations by their fellow employees because they observe them on a daily basis."). Thus, it is very much in our interest as a society to encourage employees to provide such information both to supervisors and law enforcement agencies.

Our national jurisprudence bears witness to the types of injurious activities that could be averted because of self-sacrificing whistleblowers. *See, e.g., English v. General Elec. Co.,* —— U.S. ——, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (reports by worker of violations of nuclear safety standards, including failure of co-workers to clean up radioactive material spills); *Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367 (9th Cir.1984), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2319, 85 L.Ed.2d 839 (1985) (report by delivery man to health department of shipment of adulterated milk which employer had refused to recall); *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859 (Mo.App.1985) (report to FDA by employee of optical manufacturer regarding its fabricating results of mandatory impact tests on eyeglass lenses); *McQuary v. Bel Air Convalescent Home, Inc.* 69 Or.App. 107, 684 P.2d 21 (1984) (report of patient abuse in nursing home); *Kalman v. The Grand Union Co.,* 183 N.J.Super. 153, 443 A.2d 728 (1982) (report by pharmacist of employer's plan to violate state board of pharmacy rules). In each of these cases, the whistleblower's reward for alerting the public to danger was unemployment.

Among the more highly publicized events where whistleblowing was a factor are Watergate,[9] Love Canal,[10] Three Mile Island [11]

---

**8.** Harold McGraw, Jr., Chair of McGraw–Hill Publishing Company, has similarly noted that "American society needs people ready to blow the whistle on wrongdoing, and corporate top management needs them too." *Id.* at 3.

**9.** The revelations of "Deep Throat," perhaps the most celebrated and successful whistleblower yet, provided crucial information to Bob Woodward and Carl Bernstein of the *Washington Post* concerning the Watergate burglary. The information provided by Deep Throat enabled the congressional investigating committee to learn of the plot to break into the Democratic headquarters by the Committee to Re-elect the President, and the White House's approval of the subsequent cover-up. As a result, President Nixon was forced to resign. *See generally The Whistleblowers, supra,* at 35–36.

**10.** Engineers at Hooker Chemical Company apprised their superiors in 1975 and 1976 regarding the serious danger resulting from dumping toxic wastes. Disregarding these warnings, Hooker produced the Love Canal tragedy in Niagara, New York. *See* A. Levine, *Love Canal: Science, Politics, and People* (1982); *Loyalty and Dissent, supra,* at 12; M. Brown, *Laying Waste* (1979); McNeil, *Hooker Corp. Papers Indicate Management Sanction Polluting,* N.Y. Times, Aug. 5, 1979, at 1. After obtaining the internal memoranda sent by these Hooker engineers to management, the federal government filed a $124.5 million suit against Hooker for dumping chemical wastes in the Love Canal area of upstate New York. *See Loyalty and Dissent, supra,* at 151; *see also* Molotsky, *Hooker Co. Sued By Justice Department Over Love Canal,* N.Y. Times, Dec. 21, 1979, at B2. Of the numerous private lawsuits filed, one brought by 1,300 former residents was settled for $20 million. Gruson, *Ex–Love Canal Families Get Payments,* N.Y. Times, Feb. 22, 1985, at B1.

**11.** Employees throughout the nuclear industry repeatedly brought forth information demonstrating poor quality control in the construction and maintenance of several nuclear power plants. Workers complained about improper welding, clerks complained of inadequate adherence to quality control regulations, and engineers complained of poorly designed safety systems. These nuclear whistleblowers were largely ignored until a partial meltdown occurred at Three Mile Island in 1979. *See The Whistleblowers, supra,* at 25–31. Since that event, whistleblowers have continued to bring forth allegations of faulty construction and quality control, with safety infractions requiring the halt to construction on several plants deemed by the Nuclear Regulatory Commission to be unsafe for operation. The right of the states to adopt a separate cause of action to protect whistleblowers in nuclear facilities was recently approved in *English v. General Elec. Co.,* —— U.S. ——, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

and the *Challenger* shuttle disaster.[12] Whistleblower Ernest Fitzgerald achieved national attention in his almost single-handed effort to expose waste and intentional cost overruns by defense contractors. *See generally The Whistleblowers, supra*, at 21–24; *Report on Professional Responsibility, supra*, at 39–54. Prominent engineers have similarly warned management at major corporations of alleged product defects only to see their warnings ignored, accidents and deaths occur and costly litigation begin.[13]

In a democratic, free enterprise system, a commitment to whistleblowing represents a fundamental confidence in the ability of individuals to make a difference. Society can never eradicate wrongdoing, but it can shield from retaliation those citizens who, urged on by their integrity and social responsibility, speak out to protect its well-being.

The steadily increasing size of both public and private enterprises increases the opportunity for individual anonymity and depersonalizes the perceived consequences

**12.** The space shuttle *Challenger* exploded as a result of faulty seals in the booster rockets. For years, several engineers from the Morton Thiokol Company, the major contractor responsible for construction of the rockets, had warned highly placed administrators of major problems with the booster rocket seals. On the night before the disaster, several of these engineers warned of the seal malfunction risk in cold weather. Thiokol's executives and NASA administrators overruled the engineers, and approved the launch. *The Whistleblowers, supra*, at 9–10. "Not one engineer or technician, however, supported a decision to launch." *Id., quoting* T. Bell & K. Esch, *The Fatal Flaw in Flight 51–L*, Spectrum 24 (Feb.1987).

After the disaster, "when the engineers Allan McDonald, Arnold Thompson, and Roger Boisjoly testified before the [Presidential Commission on the Space Shuttle Challenger Accident] about their strong objections to the launch, they were unceremoniously 'stripped of their authority, deprived of their staffs, and prevented from seeing the critical data about the *Challenger* disaster.'" *Id., quoting* Sanger, *Engineers Tell of Punishment for Shuttle Testimony*, N.Y. Times, May 11, 1986. These engineers, together with two others, were collectively referred to as "the five lepers" by their fellow employees. Rempel, *Challenger's Wake: Rage, Pain, Guilt*, L.A. Times, Jan. 28, 1987, at A21. Through the intervention of William Rogers, chair of the Presidential Commission, Roger Boisjoly and Allan McDonald were later selected to head Thiokol's booster redesign team. M. McConnell, *Challenger: A Major Malfunction* 257 (1987). Boisjoly was ultimately given long-term disability leave for stress-related illness. Rempel, *Challenger's Wake: Rage, Pain, Guilt, supra*, at A1.

**13.** Thomas A. Robertson, the director of development for Firestone Tire Company, warned his executives that "[w]e are making an inferior quality radial tire which will subject us to belt-edge separation at high mileage." *The Whistleblowers, supra*, at 16. Despite warnings by him and several of its other engineers, Firestone chose to market the tire. After selling twenty-four million tires, receiving repeated complaints of its tire quality and after *Time* magazine re-

ported that blowouts had caused "at least 41 deaths" and hundreds of injuries, Firestone replaced three million of the tires. This tire has also been the subject of more than 250 personal injury and wrongful death suits. *Loyalty and Dissent, supra*, at 10–11; *The Whistleblowers, supra*, at 15–16.

Frank Camps, senior principal design engineer at Ford Motor Company's testing grounds, witnessed the Ford Pinto repeatedly fail a windshield retention test mandated by federal standards. *Loyalty and Dissent, supra*, at 119. Ford management had mandated that the Pinto weigh no more than 2,000 pounds and cost no more than $2,000; thus, only minor changes to the windshield retention design could be made. *Id.* at 120. Instead, Camps alleges, the engineers intentionally channeled some kinetic energy generated by a collision away from the windshield and transmitted that energy via the drive shaft to the differential housing, which caused contact with the gas tank. *Id.* As Camps later pointed out, "[w]indshield retention was a federally mandated area of certification. Fuel system integrity, at that time, was not." *Id.* The Pinto still failed the windshield retention test five out of seven times. Camps noted that the five failures were termed "developmental tests," while the two successes were submitted as federal certification cars. *Id.* at 122.

Camps later experienced what he termed "a crises of conscience," and wrote Ford management that the car was in direct violation of federal law and should be recalled. *Id.* at 123. Camps' work appraisals deteriorated rapidly and he was soon demoted to a position totally uninvolved with federal standard compliance. After multiple similar encounters with management, Camps resigned in 1978. *Id.* at 124–27.

Ford has since been sued repeatedly for deaths and injuries caused by fuel tank explosions in the Pinto. In 1978, a California court awarded one severely injured Pinto driver $128.5 million—the largest damage award at that time in legal history. (This award was reduced on appeal. *See Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981)). *See Loyalty and Dissent, supra*, at 119–30; *The Whistleblowers, supra*, at 18–20.

of conduct that is injurious to the public, though perhaps of short-term benefit to the organization.[14] To protect society, what can be more basic than being able to respond meaningfully to the employee who, fearing that personal security will be jeopardized by exposing a public danger, poses the query: "But what about my job and the family for whom I must provide?" Realizing that "[e]mployees should not have to choose between their jobs and the demands of important public policy interests," the Arizona Supreme Court recently concluded that "actions which enhance the enforce-

ment of our laws or expose unsafe conditions, or otherwise serve some singularly public purpose, will inure to the benefit of the public." *Wagner v. City of Globe,* 150 Ariz. 82, 87, 89, 722 P.2d 250, 255, 257 (1986).

Both civil and criminal statutes reflect myriad expressions of the public policy to encourage the reporting and correction of activities harmful to our citizenry.[15] This principle is strongly stated in statutes and rules applicable to licensed professionals— physicians,[16] attorneys[17] and others[18]—which impose upon them a duty to

**14.** *See Where The Law Ends, supra,* at 23 (in burgeoning, complex organizations, it becomes increasingly difficult to attribute wrongs to any particular human wrongdoer).

**15.** These include, as the court's opinion discusses, several Texas civil statutes that protect certain classes of employees for reporting activities harmful to the public interest. *See* Tex.Rev.Civ. Stat.Ann. art. 5221k § 5.05(a) (Vernon 1989) (employees who report violations of the Commission on Human Rights Act); Tex.Rev.Civ. Stat.Ann. art. 6252–16a (Vernon Supp.1990) (public employees who report violations of law); Tex.Health & Safety Code Ann. § 242.133 (Vernon Supp.1990) (nursing home employees who report patient abuse or neglect); *id.* § 502.013 (employees who report violation of Hazard Communication Act). *See also* Tex.Penal Code § 36.06 (Vernon Supp.1990) (making it a felony to threaten harm in retaliation for reporting the occurrence of a crime or serving as an informant); *id.* § 36.05 (Vernon 1989) (coercion of witness a felony offense).

Numerous federal statutes also bar retaliation for reporting harmful activities, filing claims, or testifying in proceedings that address violations of the law. *See, e.g.,* Civil Service Reform Act, 5 U.S.C.A. § 2302(b)(8)(A) (West Supp.1990); Armed Forces, 10 U.S.C. § 2409(a) (1988) (Defense Contractors); Financial Institution Reform, Recovery, and Enforcement Act, 12 U.S. C.A. § 1790b(a) (West 1989); Toxic Substances Control Act, 15 U.S.C. § 2622(a) (1988); National Labor Relations Act, 29 U.S.C. § 158(a)(4) (1988); Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) (1988); Occupational Safety and Health Act, *id.* § 660(c)(1) (1988); Federal Mine Health and Safety Act, 30 U.S.C. § 815(c)(1) (1988); Water Pollution Control Act, 33 U.S.C. § 1367(a) (1988); Longshoreman's and Harbor Worker's Compensation Act, 33 U.S.C. § 948a (1988); Safe Drinking Water Act, 42 U.S.C.A. § 300j–9(i)(1) (West 1982 & Supp.1989); Energy Reorganization Act, 42 U.S.C. § 5851(a)(3) (1982); Solid Waste Disposal Act, 42 U.S.C. § 6971(a) (1982); Clean Air Act, *id.* § 7622(a); Comprehensive Environmental Response, Compensation, and Liability Act, *id.* § 9610(a); Fed-

eral Railroad Safety Authorization Act, 45 U.S.C. § 441(a) (1982); Surface Transportation Act, 49 U.S.C.A.App. § 2305(a) (West Supp.1990).

**16.** Section 5.06(d) of the Medical Practice Act requires physicians, medical peer review committees and medical students to "report relevant information to the [state medical] board relating to the acts of any physician ... [that] *poses a continuing threat to the public welfare through the practice of medicine.*" Tex.Rev.Civ.Stat.Ann. art. 4495b § 5.06(d) (Vernon Supp.1990) (emphasis supplied). Nor may this duty to report be altered by contract. *Id.*

**17.** State Bar Rule 8.03, entitled "Reporting Professional Misconduct," provides:

(a) A lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate disciplinary authority.

Tex.Gov't Code Ann. tit. 2, subtit. G, app., State Bar Rule 8.03 (Vernon Supp.1990). A similar duty is imposed on attorneys who have knowledge of violations of the rules of judicial conduct. *Id.*

**18.** *See, e.g.,* 22 Tex.Admin.Code § 1.146(b) (West Nov. 15, 1988) (architects); 25 Tex.Admin.Code § 313.15(c)(7) (West Supp. Nov. 1, 1989) (athletic trainers); 22 Tex.Admin.Code § 109.103(3) (West Nov. 15, 1988) (dentists); *id.* § 711.3(d)(1)(H) (dietitians); *id.* § 131.156(a)(3) (engineers); *id.* § 663.7 (land surveyors); *id.* § 217.13(11) (nurses); *id.* § 375.8 (podiatrists); *id.* § 443.2 (private investigators); *id.* § 681.48(b) (professional counselors); 25 Tex. Admin.Code § 123.12(1)(I) (West Oct. 14, 1988) (respiratory care practitioners); 40 Tex.Admin. Code § 85.6018(10) (West Jan. 2, 1989) (social workers); 22 Tex.Admin.Code § 741.41(5) (West Supp. Nov. 1, 1989) (speech language pathologists); *id.* § 573.3 (veterinarians). In addition, national codes of ethics of professional societies may impose broader reporting requirements.

report unethical conduct within the profession or to face possible license revocation.

Nor is this public policy foreign to the rules of decision in Texas courts. Stating that "a citizen has a right to be free to report violations of the law without intimidation or coercion," the court in *Sims v. Century Kiest Apartments*, 567 S.W.2d 526, 530 (Tex.Civ.App.—Dallas 1978, no writ), recognized a cause of action for a tenant who is evicted for reporting violations of the city's housing, building and health codes. Similarly, in *Goodyear Tire & Rubber Co. v. Sanford*, 540 S.W.2d 478, 483, 484 (Tex.Civ.App.—Houston [14th Dist.] 1976, no writ), the court refused to enforce an arbitration agreement "that has the effect of delaying the reporting or prosecution of violations of law" because it was contrary to public policy of the United States and Texas mandating that "[f]or the orderly functioning of our society, people must be completely free from all forms of coercion against reporting violations of the law."

The elements of this new cause of action must be carefully crafted to accomplish a dual objective—noninterference with the legitimate interest of responsible, law-abiding employers in making ordinary managerial decisions and protection for those employees who are willing to put their jobs on the line to avoid harm to the public. Recognizing the broad discretion accorded employers to make independent, good faith judgments about employees, trial courts should effectively exercise their power to render summary judgment when appropriate so that all internal management disputes are not inflated into lengthy jury trials.

To establish a prima facie cause of action, an individual must prove by a preponderance of the evidence that the principal motivation for employer retaliation was that employee's report, either internally or publicly, of activities within the workplace that would have a probable adverse effect upon the public. Additionally, there must be a two-part showing of good faith: (1) that the employee undertook to report the activities in the workplace in good faith rather than as a result of some less admirable motive such as malice, spite, jealousy or personal gain [19] and (2) the employee had reasonable cause to believe that the activities would have a probable adverse effect upon the public. While proving actual violation of a statute is not essential to satisfying this latter element,[20] the asserted wrongdoing about which complaint is made must be demonstrated to contravene substantial societal concerns reflected in our state and federal constitutions and statutes, judicial decisions and administrative decisions, rules and regulations, or other statements of public policy. The reporting of these activities must have been the principal reason for the employer's retaliation.[21] To establish causation, the employ-

---

*See, e.g.,* Code of Ethics, National Society of Professional Engineers § 2 (requiring notification of proper authorities by engineer of any observed conditions which endanger public safety and health and any plans or specifications that endanger the public health and welfare); Code of Ethics, Institute of Electrical and Electronics Engineers, art. IV, Item 1 (imposing a duty on engineers to "speak out" against abuses endangering the safety, health and welfare of the public). *See also Kalman v. The Grand Union Co.*, 183 N.J.Super. 153, 443 A.2d 728, 730 (1982) (recognizing cause of action for pharmacist discharged for reporting, as required by Code of Ethics of the American Pharmaceutical Association, violations of state pharmacy law by employer).

**19.** *Palmer*, 752 P.2d at 690; *see also Wagner*, 722 P.2d at 257 ("So long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged.").

**20.** The inquiry is whether an ordinary employee acting in good faith had reason to believe that conduct violating a statute or resulting in other adverse harm to the public had occurred or was about to occur. *See Wagner*, 722 P.2d at 257 ("The relevant inquiry is not limited to whether any particular law or regulation has been violated ... but instead emphasizes whether some 'important public policy interest embodied in the law' has been furthered by the whistleblowing activity."). *See also McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or.App. 107, 684 P.2d 21, 24 (1984).

**21.** This requirement comports with the common standards for worker protection from dismissal for other types of activities, so that "failure to establish a causal connection between the whist-

ee will necessarily have to demonstrate that the employer had knowledge of the whistleblowing prior to the retaliation. To create an inference that an individual was fired as a direct result of his complaint, the discharge must be shown to have occurred within a reasonably short time after one or more complaints were lodged.[22] The employer may refute the causation element by proving dismissal for reasons other than the act of whistleblowing. Employers remain free under present Texas law to terminate employment relationships for no reason, or for cause, but not for a very limited class of unconscionable reasons, as determined by judicial decision and statute.

The object of the employee's report should not be limited to some outside official, as Respondent recommends. Rather, internal reporting of wrongdoing should be encouraged, so that an employer may have an opportunity to investigate and remedy problems before involving outside authorities.[23] Defining the cause of action in this manner reflects our confidence that most employers are eager to avoid conduct that is potentially injurious to the public. To impose an outside reporting requirement would deprive them of an opportunity to correct, internally and without unnecessary publicity, harmful conduct which may be the result of inadvertence or a lack of communication.[24] The underlying policy goals to avert harm to the public may be just as effectively served by communication within an organization to achieve prompt compliance as they are by public disclosure.

With confidence in the power of a few courageous individuals to make a lasting contribution to improving our public and private institutions, I have outlined appropriate elements for other courts throughout Texas to employ in affording the shield from retaliation that employees need now. By applying this cause of action, the trial courts can both provide whistleblowers with vital protection and assist this court in meeting its responsibilities. It can only be hoped that the availability of legal recourse for employer retaliation will give a few employees, agonizing in silence as to whether to alert the public to danger, "the

leblowing and the subsequent discharge is fatal to an employee's suit." 1 L. Larson & P. Borowsky, *Unjust Dismissal* § 7.02[4] (1990).

**22.** The number and timing of the complaints is evidentiary. In many cases, like the one at bar, the defendant will argue that the frequency of the complaints conclusively proves that the plaintiff is not a protected whistleblower but simply a complainer. *See, e.g., Jorden v. National Guard Bureau,* 799 F.2d 99, 101 (3d Cir. 1986) ("Beginning in 1981, however, Jorden became either a 'whistleblower' or a 'troublemaker,' depending on whom one believes."); *Egger v. Phillips,* 710 F.2d 292, 324 (7th Cir.1983) (Cudahy, J., concurring) ("The problem in the instant case is, of course, to distinguish between Phillips' reactions to Egger as a 'whistleblower' and corruption fighter and his reaction to Egger as an eccentric troublemaker."). We must heed the observation in *Greenberg v. Kmetko,* 840 F.2d 467, 477 (7th Cir.1988) (Cudahy, J., dissenting), that:

> Dissenters and whistleblowers rarely win popularity contests or Dale Carnegie awards. They are frequently irritating and unsettling. These qualities, however, do not necessarily make their views wrong or unhelpful....

*See also Report on Professional Responsibility, supra,* at 26.

**23.** A whistleblower cause of action has been allowed where the employee first reported internal wrongdoing to his employer. *See Wheeler v. Caterpillar Tractor Co.,* 108 Ill.2d 502, 92 Ill.Dec. 561, 563, 565, 485 N.E.2d 372, 374, 376 (1985); *Harless,* 246 S.E.2d at 272; *Sheets,* 427 A.2d at 386.

**24.** As one commentator has observed:

> [I]t is important to note that almost all the writing on whistle blowing—by courts, arbitrators, business executives, public-interest group leaders, and civil liberties advocates— stresses that employees have a general obligation to raise their protest inside the company before taking it to government bodies or the public. This is to ensure that management has a chance to correct any mistakes that may be the result of inadvertence, bad judgment by subordinates, or a failure to recognize that a problem existed.

*Loyalty and Dissent, supra,* at 149. *See also Whistleblowing in Biomedical Research, supra,* at 184.

courage to take the final, extra step." [25]

RAY and MAUZY, JJ., join in this concurrence.

---

**25.** *Where The Law Ends, supra,* at 216.