Don HIGGINBOTHAM, Appellant,

v.

ALLWASTE, INC., Allwaste Asbestos Abatement, Inc., and Allwaste Asbestos Abatement of Houston, Inc., Appellees.

No. C14–93–00936–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 15, 1994.

Rehearing Overruled Oct. 13, 1994.

Thomas E. Bilek, Houston, for appellant.

Philip J. John, Jr., Marian L. Brancaccio, Michael L. Brem, Houston, for appellees.

Before ROBERTSON, CANNON and DRAUGHN, JJ.

## OPINION

CANNON, Justice.

Don Higginbotham appeals the decision of the district court granting summary judgment in favor of appellees that he take nothing as a result of his action. He brings two points of error alleging the court below erred in granting the summary judgment because material issues of fact exist, and also challenging the district court's decision to strike the deposition testimony of three witnesses. Appellees bring one cross-point of error challenging the district court's decision to consider certain documents as evidence in Plaintiff's Response to Defendant's Motion for Summary Judgment. We reverse and remand.

The parties to this suit are Don Higginbotham ("Higginbotham"), Allwaste, Inc., ("Allwaste"), and its two wholly owned subsidiaries, Allwaste Asbestos Abatement, Inc. ("AAA"), and Allwaste Asbestos Abatement of Houston, Inc. ("AAA–Houston"). Allwaste is a publicly held company and required by federal law to file accurate statements of its financial condition with the Securities and Exchange Commission ("SEC").

Higginbotham alleges he was fired because he refused to hide material overstatements of the third-quarter 1990 profits of AAA–Houston from Allwaste's internal auditor, and refused to be a party to the reporting of any additional material overstatements. Higginbotham states he was instructed by three members of AAA management—Wayne Rachlen, Dom Populo, and Paul Verrochi—to prepare schedules and rehearse answers to questions that would conceal information from Darren Miller, Allwaste's internal auditor. Miller had the responsibility of preparing the financial reports to be filed with the SEC. Higginbotham was instructed to submit narrowly tailored reports, give true answers, and not to volunteer information. Although strictly truthful, this course of conduct would nonetheless have had the result of misleading the internal auditor as to the nature of the subsidiaries' actual earnings. Because Miller had the responsibility for preparing the SEC reports, the resultant conduct could eventually lead to misleading reports being filed with that federal agency. Higginbotham also alleges appellees intentionally and tortiously inflicted emotional distress, and negligently misrepresented to him that he would be allowed to perform his job in accordance with generally accepted accounting principles.

On appeal, appellees argue the district court properly granted the summary judgment because they were entitled to judgment as a matter of law. The standards for reviewing a motion for summary judgment are well established. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. In deciding whether there is a disputed material fact issue precluding

summary judgment, evidence favorable to the non-movant will be taken as true. Every possible inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Nixon v. Mr. Property Management, Inc.,* 690 S.W.2d 546, 548–549 (Tex. 1985).

The parameters for a claim of wrongful termination for refusing to engage in illegal conduct are delineated by the Texas Supreme Court's decisions in *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex. 1985) and *Winters v. Houston Chronicle Pub. Co.,* 795 S.W.2d 723 (Tex.1990). These cases carve out an exception to the long standing rule in Texas that employment for an indefinite term may be terminated at will and without cause. *Winters,* 795 S.W.2d at 724. This is often referred to as the "employment-at-will" doctrine. In *Sabine Pilot,* the Court acknowledged a narrow exception to this doctrine for employees discharged for the sole reason they refused to perform an illegal act. *Sabine Pilot,* 687 S.W.2d 735. *Winters* subsequently narrowed that exception by holding a plaintiff may only recover if he was "unacceptably forced to choose between risking criminal liability or being discharged. . . ." *Winters,* 795 S.W.2d at 724.

However, we do not read *Winters* so narrowly as to hold that an employer must directly confront an employee and make an affirmative statement that the employee will be terminated if he refuses to perform an illegal act. Such a holding would insulate employers from liability so long as they merely asked the employee to do the illegal act, without mentioning possible termination, and then, if the employee refused, later discharge him. The fact that an employee refuses to perform an action, whether legal or not, can be viewed as insubordination. Employees are always subject to discharge for insubordination. Consequently, when an employer asks an employee to perform some act which is illegal, he automatically puts the employee to the "unacceptable" choice of risking criminal liability or being discharged because the employee is placed under the onus of being terminated for insubordination.

In their motion, appellees advanced three arguments as to why they were enti-

tled to summary judgment as a matter of law on Higginbotham's wrongful termination claim. They defend those arguments on appeal. Appellees first argue Higginbotham's testimony established there was no sole reason he was terminated. They say he admitted he was fired for other reasons, to wit, a personality conflict with the management based in Boston, a threat, distrust, and disloyalty. Higginbotham responded that the personality conflict, "disloyalty," and distrust were a direct result of his refusing to take part in the scheme to deceive the auditor. The threat he made was to "see some people go to jail" for engaging in that course of conduct—in other words, a thinly veiled threat to report the conduct to the authorities. The relevant deposition testimony is set out below:

QUESTION: Did you have a personality conflict with the people in Boston?

ANSWER: Yes.

QUESTION: Did you blow up at them?

ANSWER: Yes.

QUESTION: That was one of the reasons you left, wasn't it?

ANSWER: I didn't leave. I told you awhile ago.

QUESTION: They eliminated your position.

ANSWER: They eliminated my position.

QUESTION: Do you think in part because of your personality conflict with them?

ANSWER: In part.

\*   \*   \*   \*   \*   \*

ANSWER: I'm suing because I feel like that I was terminated because of the threat I made to Bubba Nelson [that "I'd see some people go to jail."], because of my distrust and disloyalty, and the fact that I would not fall in line with the people in Boston. . . .

The testimony does not conclusively establish whether Higginbotham was fired because he refused to deceive the auditor or whether he was fired for other reasons. The testimony could be interpreted to mean Higginbotham was terminated because he made threats, was disloyal and distrustful, and had a personality conflict with the upper

management. The testimony could also be interpreted to mean that Higginbotham was fired because he "blew the whistle" on attempts to deceive the auditor, and that the "disloyalty," "distrust," "personality conflict," and "threat to see some people go to jail," occurred as a direct result of his whistle blowing conduct. The latter is a reasonable inference from the facts. Any doubts should have been resolved in Higginbotham's favor by the district court. Because the evidence could be resolved by a trier of fact in favor of either party, we find that there was a genuine issue of material fact.

■ Appellees also argue Higginbotham was not terminated, but (1) he resigned, or (2) his position was merely eliminated. They point to the deposition testimony of Frank Fradella. Fradella stated Higginbotham resigned. Higginbotham directly contradicted this by stating in his own deposition that his position was eliminated. The conflicting testimony raises a material issue of fact which is properly resolved by the jury. Appellees likewise appear to argue because Higginbotham admitted his position was eliminated, he was not terminated and therefore has no cause of action. We disagree. A position may be "eliminated" as a retaliatory measure. In that context, there is no difference between having the position "eliminated" and being terminated. The effect on the employee is the same. Whether the position was eliminated as part of a business decision or in retaliation for Higginbotham's blowing the whistle is a genuine issue of material fact to be resolved by the jury.

■ Appellees next argue Higginbotham admitted he never refused to perform any act. They also argue the "acts" he was asked to perform were not illegal. *Sabine Pilot* requires that a plaintiff must have been discharged for the sole reason that he *refused* to perform an *illegal* act. Appellees rely on the following deposition testimony by Higginbotham to support their argument:

QUESTION: Was there anything that you were asked to do that you refused to do?

ANSWER: I can't think of anything at this time.

QUESTION: And, anytime you were asked to make an adjustment or do anything as part of your job, you did it?

ANSWER: That's correct.

QUESTION: Regardless of whether you felt it was right or wrong?

ANSWER: That's correct.

\*     \*     \*     \*     \*     \*

QUESTION: When you were asked to do things, did you do them? Did you prepare the schedules you were asked to prepare?

ANSWER: Yes, I did.

Additional testimony includes the following statements:

QUESTION: In fact, you weren't asked to do anything illegal?

ANSWER: Well, I was asked. I was instructed and guided in deceiving the audit. I don't think that's legal.

\*     \*     \*     \*     \*     \*

QUESTION: As I understand it, what [Rachlen] was telling you is not to volunteer anything to the internal auditors. And if they ask you a question, answer it, but answer only what they ask. Is my recollection correct in that?

ANSWER: That's correct.

\*     \*     \*     \*     \*     \*

QUESTION: [Rachlen] told you to prepare schedules; he told you to give Darren [Miller, Allwaste's Manager of Internal Audit] certain information; if Darren asks [for] more, to get with him, and he would tell you what to say?

ANSWER: That's correct.

QUESTION: What else did Wayne tell you to say about Entex?

ANSWER: I can't remember anything.

\*     \*     \*     \*     \*     \*

QUESTION: Did Wayne ever ask you to put down any false numbers?

ANSWER: No he didn't.

\*     \*     \*     \*     \*     \*

QUESTION: So, as far as you know, all the numbers that were ever prepared and shown to Darren Miller or done on behalf of Wayne were correct numbers?

ANSWER: The numbers were correct.

QUESTION: What you're talking about now, as I understand it, is a formatting of the information?

ANSWER: That's correct.

\* \* \* \* \* \*

QUESTION: [D]id any one ever tell you to lie to somebody?

ANSWER: No.

\* \* \* \* \* \*

Higginbotham, however, disputes appellees' interpretation of these statements. He argues first that the above statements must be put into context:

QUESTION: Isn't it your feeling that you did everything they asked you to do; and despite all that, they couldn't find you another job?

ANSWER: I did—I was a good employee, if that's what you['re] saying. I was a good employee.

QUESTION: I'm saying that whatever they asked you to do as part of your job, you did it?

ANSWER: I had no intentions of going along with the concealment of information.

QUESTION: And you didn't?

ANSWER: And I didn't

\* \* \* \* \* \*

QUESTION: Whatever they asked you to do, you did?

ANSWER: Up to trying to deceive the audit. I did not participate in that.

QUESTION: And you didn't do that. You didn't do that.

ANSWER: That's correct.

QUESTION: We all understand that.

Higginbotham's summary judgment affidavit also reflects that he was instructed by Wayne Rachlen to prepare schedules and rehearse answers to questions to conceal information from the auditor. He stated he was expressly instructed to prepare condensed schedules which would hide adjustments that were taken on a contract by AAA–Houston in the third quarter. He averred he spent three months and over 100 hours rehearsing answers to questions with Rachlen.

Higginbotham also presented evidence to the district court that the auditor, Darren Miller, had determined the AAA management had acted deceptively in that "they were trying to hide the one million dollars costs in excess of billings on Entex" by preparing "special schedules," delaying the start of the audit, preparing "special margin analysis," and "coach[ing] employees' responses to questions."

A reasonable inference from the deposition testimony and other evidence is that Higginbotham performed his various duties, but refused to go along with the plans to deceive the auditor. Because this evidence could be resolved in favor of either party by the trier of fact, we find that there was a genuine issue of material fact.

Appellees argue the conduct was not illegal. They continue to stand on statements by Higginbotham that (1) he was not told to lie to anyone, (2) he was told to give carefully rehearsed, but truthful, answers to the auditor, (3) he was told not to volunteer information, (4) he was to report requests for additional information, and the progress of the audit, to upper management, and (5) he was instructed to submit condensed schedules of financial information which hid the true earnings of AAA–Houston to the auditor. We agree this information may well have been strictly truthful. However, it was a scheme to present the earnings of AAA–Houston to the auditor as artificially inflated by about $1,500,000.00. Had it succeeded, the information could have trickled up to be reflected in the reports filed with the SEC by the parent company. Those reports would have been false and misleading. Filing false and misleading reports with the SEC violates federal law.

Although Higginbotham would not have been the party filing the report, we note that 15 U.S.C. § 78ff(a) provides, in part, "... any person who willfully and knowingly makes, *or causes to be made*, any statement in any application, *report*, or document required to be filed under this chapter or any rule or regulation thereunder ..., which statement was false and misleading with re-

spect to any material fact, ...." (emphasis ours) shall be subject to criminal penalties upon conviction. By misleading the auditor, even truthfully, Higginbotham could have been guilty of "causing to be made" a statement in the SEC report which was "false and misleading" regarding a "material fact." The fact that Higginbotham's conduct may have been truthful does not alter the fact that what he would have intended to do was to cause a false and misleading report to be filed with the SEC. We note Higginbotham might also have been liable under 18 U.S.C. § 1001, covering fraud and false statements to the federal government in any matter, 18 U.S.C. § 2, making those who aid and abet parties who commit an offense against the U.S. government liable as a principal, and 18 U.S.C. § 1341 and 18 U.S.C. § 1343, covering mail and wire fraud and which are frequently prosecuted along with securities violations.

The only manner in which a determination can be made as to whether (1) the conduct requested of Higginbotham misled or would have misled the auditor, (2) the information would have been reflected in the SEC reports of the parent company, and (3) would have been a false and misleading statement of a material fact, as presented in the SEC report, is by an examination of documentary evidence, and fact and expert witness testimony, weighing the credibility of all the evidence, and resolving the fact issues. That is the job of the trier of fact. Once the trier of fact determines what the true facts are, then the court applies the law to determine whether the conduct requested of Higginbotham would have exposed him to criminal liability.

■ Appellees next argue Higginbotham was not put to that "unacceptable choice" of risking criminal liability or being discharged and that his cause of action is foreclosed by the holding in *Winters*. Appellees rely on the following deposition testimony, given by Higginbotham, to support their claim:

QUESTION: And no one ever came to you and said, "I want you to do an illegal act, or else you're fired;" that never happened?
ANSWER: That's correct.

As stated earlier, we are not convinced the Supreme Court's holding in *Winters* stands for the proposition that an employer must specifically confront an employee and inform that employee he will be fired if he does not perform an illegal act. Generally, one who seeks the performance of an illegal act does so with subtlety and stealth. Once the employee is asked to perform the illegal act, he is put at risk of discharge if he refuses to do it. The scenario becomes more complex where, as may have been the fact in the case at bar, the supervisor or upper level manager believes the conduct he is asking the employee to perform is legal and termination of the employee for insubordination is therefore justified. Thus, we find, under the Supreme Court's holding in *Winters*, merely asking an employee to perform an illegal act automatically puts him to that unacceptable choice of doing the act or risking termination. For the foregoing reasons, the district court erred in granting summary judgment on the grounds Higginbotham had not been put to an unacceptable choice of doing an illegal act or being fired.

■ We likewise conclude the district court improperly granted summary judgment as to Higginbotham's intentional infliction of emotional distress claim. In reaching this conclusion, we first reject appellees' contention their conduct was not extreme and outrageous as a matter of law. The Texas Supreme Court has defined outrageous conduct as conduct that goes "beyond all possible bounds of decency, and ... [is] regarded as atrocious, and utterly intolerable in a civilized community." *Wornick v. Casas*, 856 S.W.2d 732, 734 (Tex.1993). Higginbotham alleged his emotional distress resulted from losing his job after he refused to participate in illegal conduct. Unlawful conduct is intolerable in a civilized community. To terminate an individual's employment because he refused to participate in illegal activity is equally intolerable in that it rewards those who engage in such conduct and punishes those who do not, a kind of sophisticated "get the informant result." If Higginbotham can prove by a preponderance of the evidence (1) the conduct he was asked to participate in would have violated federal law, as he claims, (2) he refused to participate in the course of conduct, and (3) he was terminated for that

refusal, then he has likewise demonstrated appellees' conduct was extreme and outrageous. The district court erred in finding appellees' conduct was not extreme and outrageous as a matter of law.

■ Appellees also argue Higginbotham's own deposition testimony demonstrated his alleged emotional distress was not severe as a matter of law. Higginbotham admitted he did not seek any kind of treatment to alleviate his alleged suffering. However, whether or not a plaintiff sought treatment is merely evidence of the severity of the emotional distress; it is not conclusive. Proof of feeling depressed, confused, frightened, angry, sacred, and changes in physical appearance and demeanor can also establish emotional distress. *See, American Medical International, Inc., v. Giurintano*, 821 S.W.2d 331, 343 (Tex.App.— Houston [14th Dist.] 1991, no writ); *State Farm Mutual Auto Ins. Co., v. Zubiate*, 808 S.W.2d 590, 600–01 (Tex.App.—El Paso 1991, writ denied); *City of Ingleside v. Kneuper*, 768 S.W.2d 451, 460 (Tex.App.—Austin 1989, no writ). Higginbotham is correct when he states that although proof of visiting a doctor can support a claim of severe emotional distress, it is not the *only* or *exclusive* method of proving severe emotional distress.

■ Appellees also rely on Higginbotham's testimony that what he really wanted was to transfer to another Allwaste subsidiary. They point out Higginbotham even came back to Allwaste to do two weeks of contract work following his termination. While this testimony certainly tends to show Higginbotham did not suffer severe emotional distress because of appellees' conduct, again, it is not conclusive. It is merely evidence cutting against Higginbotham's case to be properly weighed and considered by the trier of fact. The district court erred in finding this testimony proved as a matter of law the distress was not severe.

We hold there are material issues of fact to be resolved and that appellees are not entitled to judgment as a matter of law. We sustain appellant's first point of error. In his second point of error, Higginbotham argues the district court erred in striking portions of his own deposition, and those of Vince Milano and Ed McDonough. Higginbotham concedes the evidence contained in the affidavits is not necessary to reverse the grant of summary judgment, and we agree.

Nonetheless, Higginbotham urges us to consider this point for the reason it will assist the district court upon trial of this action. We disagree. In effect, Higginbotham is asking us to decide an issue before it arises. The fact that the trial court sustained appellees' objections to the affidavits during the course of the summary judgment proceeding does not mean the experts are precluded from testifying at trial. The district court is only saying the evidence, in the form currently presented, was not proper summary judgment evidence. Because we have already reversed the summary judgment, we need not decide whether the district court acted properly in striking this testimony. Therefore, we decline to rule on Higginbotham's second point of error.

■ Appellees bring one cross-point of error. They allege the trial court erred in failing to strike Higginbotham's documentary evidence. Appellees argue the exhibits were not properly authenticated and lacked a proper predicate to establish their admissibility. We disagree.

The record shows that the motion for summary judgment was set for oral hearing on August 20, 1993. One day before the hearing, appellees filed objections to Higginbotham's summary judgment evidence. They contended the documents constituted hearsay and had not been authenticated. The following day, but before the hearing, Higginbotham filed a response to the objections. He argued that depositions attached to the response cured any form defects in the summary judgment record and requested the court to consider the depositions. The court did.

■ The district court has discretion to allow the admission of evidence and to allow any party to cure defects in the form of the summary judgment evidence. *See, Kolb v. Texas Employers' Insurance Ass'n*, 585 S.W.2d 870 (Tex.Civ.App.—Texarkana 1979,

writ ref'd n.r.e.). Higginbotham cured the defects prior to the hearing. Appellees have failed to show the district court abused its discretion. Therefore, we overrule appellees' cross-point of error. We reverse the judgment of the district court and remand this cause for further proceedings not inconsistent with our opinion.