# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00626-CV

**Safeshred, Inc., Appellant**

**v.**

**Louis Martinez, III, Appellee**

## FROM COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY
## NO. C-1-CV-07-013578, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

## O P I N I O N

Safeshred, Inc. fired Louis Martinez after he refused to drive a commercial vehicle he found to be unsafe and noncompliant with federal and state regulations. Martinez sued Safeshred, alleging he had been terminated for refusing to commit an illegal act. *See Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985) (recognizing exception to at-will-employment doctrine when employee is fired for refusal to commit illegal act). After a jury trial, the trial court entered judgment awarding Martinez $7,569.18 in economic damages for lost wages and benefits, $10,000 in compensatory damages for non-economic losses, including mental anguish, and $200,000 in exemplary damages. Safeshred appeals, arguing in five issues on appeal that (1) exemplary damages are not available in a *Sabine Pilot* cause of action absent the showing of an independent tort; (2) the evidence is legally and factually insufficient to prove malice, a predicate finding to an award of exemplary damages; (3) the amount of exemplary damages awarded is so excessive as to violate the United States Constitution and Texas law; (4) compensatory damages for mental anguish

and related emotional losses are not available in a *Sabine Pilot* cause of action absent the showing of an independent tort; and (5) the evidence is legally and factually insufficient to support the award of compensatory damages. We affirm the awards of economic and exemplary damages and reverse the award of compensatory damages for non-economic losses.[1]

## BACKGROUND

Martinez began work delivering documents for Safeshred's sister company, Safesite, on September 25, 2007.[2] After only three days of work, Martinez was promoted to a position driving commercial vehicles for Safeshred.[3] At Safeshred, Martinez's responsibilities included driving an eighteen-wheeler with a 53-foot van from Safeshred's location in Austin to company facilities in Dallas, Houston, and San Antonio. Martinez would pick up documents that those facilities had collected and bring them to Austin for shredding.

On Monday, October 1, 2007, his first day with Safeshred, Martinez performed a pre-trip inspection on the vehicle he was to drive, as he was required to do as a licensed commercial driver. His inspection revealed several violations of federal and state regulations. Specifically, Martinez found that the cab lacked both a Texas Department of Transportation (TxDOT) identification number on the side of the door and required markings identifying the vehicle as commercial. In addition, the dealer's tag on the vehicle had been expired for one year.

---

[1] Safeshred does not appeal the award of economic damages for lost wages and benefits.

[2] The facts recited herein are from the testimony and exhibits admitted at trial.

[3] Safeshred and Safesite share a common owner, and the operations of the two companies frequently overlap.

Martinez testified that he told Donald Wallace, the president of Safeshred, about these failures in compliance, specifically indicating that it would be illegal to drive the truck in its condition.[4] According to Martinez, Wallace said that he would look into the violations, but told Martinez to drive the vehicle anyway. Martinez proceeded to drive the vehicle for the remainder of his first week at Safeshred. He testified that he decided to drive the vehicle based on his conclusion that the violations did not present any safety issues and his desire to keep his job. No action was taken to remedy the violations.

On Friday of Martinez's first week with Safeshred, he was informed that he would be hauling a load of industrial shelving to Shertz, Texas, the following Monday. The load would consist of eight-foot-long steel rails and twenty-foot-long steel uprights stacked on a flatbed trailer. Over the weekend, Martinez reviewed the rules and regulations regarding securing loads on flatbed trailers.[5]

On Monday, October 8th, Martinez performed a pre-trip inspection of the cab and flatbed trailer he was to drive. Martinez found the same violations he had previously noted on the cab, including the missing TxDOT identification number, missing commercial markings, and the expired dealer's tag. In addition, Martinez found violations in the condition of the flatbed trailer. The trailer was missing a reflector lens on one of its lights and a lug nut on one of its wheel wells.

---

[4] Wallace's testimony conflicts with Martinez's on this point. Wallace testified that Martinez did not raise any safety or compliance issues to him prior to October 8, 2007.

[5] Martinez testified that he kept a copy of TxDOT regulations with him when working and a copy of the portions of the Code of Federal Regulations pertaining to commercial transportation at his home.

In addition, there was no dunnage between the rows of steel stacked on the flatbed trailer.[6] Finally, Martinez discovered cuts in two of the nylon straps used to secure the load of steel. The four-inch-wide strap used to secure the load had a one-inch cut in it, while the three-inch-wide strap used to the secure the load had a three-quarter-inch cut in it.[7]

Martinez testified that he told one of his supervisors—either Linden Kroll, the delivery manager at Safesite, or Kirk Tooley, the operations manager at Safesite—that the load was unsafe and illegal to haul. He specified each of the violations he had discovered in the cab and the flatbed trailer. Martinez was nonetheless instructed to drive the load to Shertz.

On his way to Shertz, Martinez was pulled over by a Texas Department of Public Safety (DPS) officer to inspect the weight of the load.[8] In the course of weighing the vehicle, the officer discovered several of the violations that Martinez had pointed out.[9] Noting the federal or state regulation violated in each instance, the officer prepared a citation for the missing TxDOT identification number, missing commercial markings, and expired dealer's tag on the cab. The citation also listed the missing lug nut and reflector lens on the trailer. Finally, the citation noted the improper tiedown devices used in violation of section 393.106(b) of the Federal Motor Carrier Safety

---

[6] Dunnage refers to material placed in gaps in loads to prevent the loads from shifting and moving while in transit.

[7] Martinez took photographs of the cab and trailer to highlight these violations, and also took photographs of the loads he was asked to haul on October 15th and October 17th. These photographs were admitted into evidence at trial.

[8] Martinez was not cited for any moving violations.

[9] The citation also listed two additional violations, for a missing TxDOT insurance cab card and an expired inspection certificate, that Martinez had not discovered in the course of his own inspection.

4

Regulations, which states that "[c]argo must be firmly immobilized or secured on or within a vehicle by structures of adequate strength, dunnage or dunnage bags, shoring bars, tiedowns or a combination of these." 49 C.F.R. § 393.106(b) (2006).[10] Specifically, the officer pointed out to Martinez that the nylon straps used to secure the load had cuts in them in violation of federal regulations.

After the officer prepared the citation and orally explained each violation to Martinez, he told Martinez that he could finish delivering his load, but also ordered the vehicle not to be used again until the violations were remedied. Accordingly, after finishing his delivery and returning the vehicle to Safesite, Martinez informed Wallace, Tooley, and Kroll of the violations. He showed the citation to each of them, and Tooley made a copy of it. Martinez told Tooley that the officer had instructed him not to move the cab and trailer until the violations had been remedied.

The next day, October 9th, Tooley asked Martinez to drive the cab to Abilene to pick up a belly-dump trailer.[11] None of the violations pertaining to the cab had been remedied. Martinez

---

[10] During his testimony, Martinez noted that use of the damaged strap also violated two other Federal Motor Carrier Safety Regulations. Section 393.100 contains similar content to section 393.106(b), stating that cargo must be "secured . . . to prevent shifting upon or within the vehicle to such an extent that the vehicle's stability or maneuverability is adversely affected." 49 C.F.R. § 393.100 (2002). Section 393.104(b) specifically addresses the straps used to secure a load, stating, "All tiedowns . . . must be in proper working order when used to perform that function with no damaged or weakened components, such as, but not limited to, cracks or cuts . . . ." *Id.* § 393.104(b) (2006). Martinez testified that he reviewed these regulations, in addition to section 393.106(b), prior to driving the first load of steel shelving to Shertz.

[11] The testimony of Tooley and Wallace conflict with Martinez's account. Tooley testified that he never asked Martinez to drive to Abilene on October 9th. Wallace, on the other hand, testified that Martinez was asked to drive the cab to Abilene and initially agreed, indicating that he knew how to avoid any "DPS places" on the way. Wallace went on to testify, "I believe [Martinez eventually] refused to take [the cab to Abilene] because he didn't want to take the $24,000 check" to pay for the belly-dump trailer. Despite these conflicts, all witnesses agree that Martinez did not drive the cab on October 9th, but instead made the trip to Abilene on October 16th, after the cab had been brought into compliance with federal and state regulations.

5

refused to drive the cab, telling Tooley that he could not drive the cab until it was brought up to code. Martinez testified that Tooley "repeatedly" tried to convince him to drive the cab and that he feared that Tooley would fire him. Instead, due to his refusal to drive the noncompliant vehicle, Martinez was assigned document-delivery tasks for Safesite for the remainder of the week.

On the following Monday, October 15th, Martinez was given a second load of steel shelving to haul to Shertz. During his pre-trip inspection, Martinez noted that the cab had been brought into compliance with federal and state regulations. Martinez, however, found violations concerning the way in which the load had been secured on the flatbed trailer. Specifically, the load lacked dunnage between the rows of steel, and the same three-inch-wide strap that had a three-quarter-inch cut in it was still being used to secure the stacks of steel.

Martinez informed Kroll of the violations, but Kroll instructed him to drive the load to Shertz. Martinez then informed Tooley, who also instructed him to take the load as it was. During the trip, Martinez testified that the load was shifting as he drove, causing the trailer to sway left and right and affecting the handling of the vehicle. Martinez testified that he was worried about the safety of himself and others due to the instability of the load of steel.

Two days later, on October 17th, Safeshred again asked Martinez to haul a load of steel shelving. During his pre-trip inspection, Martinez noted that the same damaged three-inch-wide strap was still being used to secure the steel and that there was again no dunnage between the stacks of steel. The steel stacks were also higher than they had been in previous loads, rising above the roof of the cab, and had already begun to shift before Martinez started driving the vehicle. In addition, the steel was hanging off of the back of the trailer by roughly three feet.[12]

_____

[12] Martinez admitted at trial that the fact that the steel was hanging off of the back of the flatbed trailer by three feet was not a violation of any federal or state regulations.

6

Martinez told Kroll and Tooley that the load was illegal and unsafe to drive, as the damaged three-inch-long strap was still being used, the load was stacked too high, the load was not properly secured due to lack of dunnage, and the load was hanging too far off of the back of the trailer.[13] Martinez was instructed to drive the load.

From the start of the trip, Martinez found it difficult to steer and maneuver the cab. Martinez could see the load shifting as he drove and could hear the load creaking. After driving the load for five miles, Martinez turned around and then returned the load to Safesite. Upon parking the vehicle, Martinez confirmed that the load had shifted during his short trip.

Martinez reiterated to Kroll and Tooley that the load was illegally secured and unsafe to drive. Tooley called Wallace, who was in a restaurant in Colorado at the time, and told him that Martinez was refusing to drive the vehicle. Wallace asked Tooley to contact TxDOT regarding the overhang off of the back of the trailer. Wallace also asked his father, Dalton Wallace,[14] to inspect the load.

Between 30 and 90 minutes later, Tooley called Wallace back to inform him that the overhang in the back did not violate TxDOT rules. He also told Wallace that he, Kroll, and Dalton

---

[13] Tooley testified that he and Martinez spoke before Martinez started out with the load on the 17th, but that they did not discuss safety or compliance issues.

[14] Dalton Wallace is the owner of Safesite and Safeshred. Dalton Wallace testified that he has "hauled thousands of loads" in his long career in commercial transportation and "know[s] what a safe load is," but also admitted that he had never obtained a commercial driver's license.

7

Wallace had all found the load to be safe.[15]  Tooley testified that he recommended to Wallace that Martinez be fired due to his refusal to take the load.

Wallace asked to speak to Martinez.  Martinez testified that he told Wallace about the illegal strap, the lack of dunnage, and the overhang in the back.[16]  Wallace told Martinez that he had been hired to drive the truck to Shertz, and said, "[Y]ou can either get in my truck and leave, or you can get in your truck and leave."  Martinez handed the phone back to Tooley, saying that Wallace had fired him.[17]

After Wallace fired Martinez, Tooley filled out a company form recording Martinez's termination.  In the explanatory area, Tooley wrote, "Louis abandoned his job after he refused to perform his job."  Tooley also testified at trial that he believed that Wallace had not fired Martinez, but instead that Martinez had voluntarily abandoned his job.  On the form, Tooley marked "no" to the question of whether Martinez was eligible for rehire.

After Martinez's termination, the load sat untouched on Safesite property until October 22, 2007, when a temporary worker was hired to drive the load.  On the way to Shertz, the

---

[15]  Wallace testified that he knew at the time of the phone call that his father, Tooley, and Saul Reyes, the employee who loaded the flatbed trailer, were all unfamiliar with the regulations governing flatbed trailers.  In addition, Kroll, the only licensed commercial driver besides Martinez at the site, testified that he could not remember when he had last reviewed DPS or federal regulations regarding the loading of flatbed trailers.

[16]  Wallace testified that Martinez told him that the load was unsafe, but specified only that the load was hanging too far off of the back of the trailer.

[17]  Wallace agreed, testifying at trial that "I terminated [Martinez] from a restaurant" and "I did fire him."

8

load of steel broke loose and crashed through the back window of the cab. Though neither the driver nor other motorists were hurt, the accident caused $1,800 worth of damage to the cab.

Martinez brought suit for termination for failure to commit an illegal act. *See Sabine Pilot*, 687 S.W.2d at 735. At trial, Martinez testified that actions of his supervisors at Safeshred had subjected him to a great deal of stress and caused him to lose "a lot" of sleep. At the conclusion of the jury trial, the trial court entered judgment awarding Martinez $7,569.18 in economic damages for lost wages and employee benefits, $10,000 in compensatory damages for non-economic losses, including mental anguish, and $200,000 in exemplary damages. This appeal followed.

**STANDARD OF REVIEW**

Appellate courts review legal determinations de novo. *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007). A jury's factual determinations, on the other hand, receive more deferential review based on the sufficiency of the evidence. *Id.*

When reviewing a jury finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable fact-finder could not, and reverse the fact-finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded fact-finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain the appellants' legal-sufficiency challenges if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a

9

vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When reviewing a jury finding for factual sufficiency, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under either standard of review, we must be mindful that the jury as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raymond v. Rahme*, 78 S.W.3d 552, 556 (Tex. App.—Austin 2002, no pet.). The jury may choose to believe one witness and disbelieve another, and we must not impose our own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819.[18]

We review the amount of exemplary damages awarded by a jury de novo to ensure that the award is not grossly disproportional to the gravity of the defendant's conduct. *Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004).

## DISCUSSION

### *Availability of Punitive Damages*

In its first issue on appeal, Safeshred argues that a *Sabine Pilot* cause of action does not support an award of exemplary or punitive damages without evidence of an independent tort. This is an issue of first impression in this Court.

---

[18] We note that traditional legal and factual-sufficiency standards of review vary when evaluating factual findings under a clear-and-convincing standard of proof. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under the clear-and-convincing standard, we inquire whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.*

The *Sabine Pilot* cause of action is an exception to the at-will-employment doctrine adopted in Texas courts. Under the traditional at-will-employment doctrine in Texas, employment for an indefinite term may be ended at will and without cause. *Sabine Pilot*, 687 S.W.2d at 734-35; *see also East Line & R.R.R. Co. v. Scott*, 72 Tex. 70, 10 S.W. 99, 102 (1888). The *Sabine Pilot* exception, however, "afford[s] employees protection from retaliatory discharge for refusing to engage in illegal conduct." *Winters v. Houston Chronicle Pub. Co.*, 795 S.W.2d 723, 725 (Tex. 1990) (Doggett, J., concurring). Under the exception, an employee can recover by showing "by a preponderance of the evidence that his discharge was for no other reason than his refusal to perform an illegal act." *Sabine Pilot*, 687 S.W.2d at 735.

The supreme court did not reach the issue of available damages in its *Sabine Pilot* decision, and there are no other common-law exceptions for retaliatory discharge in Texas to provide guidance.[19] However, Justice Kilgarlin stated in his concurring opinion in *Sabine Pilot* that recoverable "damages would include loss of wages . . . and employee retirement benefits," and "would also include punitive damages." *Id.* at 736 (Kilgarlin, J., concurring). Justice Kilgarlin based his conclusions on a comparison of the *Sabine Pilot* cause of action to the Texas Anti-Retaliation statute.[20] *Id.*

---

[19] While the Texas Supreme Court recognized a second public-policy exception for termination due to an employer's desire to avoid paying pension benefits, the court's decision was reversed by the United States Supreme Court on the basis of ERISA preemption. *See McClendon v. Ingersoll-Rand Co.*, 779 S.W.2d 69 (Tex. 1989), *reversed*, 498 U.S. 133 (1990).

[20] The Anti-Retaliation statute, formerly codified as Tex. Rev. Civ. Stat. Ann. art. 8307c, has been recodified as Tex. Lab. Code Ann. §§ 451.001-.003 (West 2006). *See City of LaPorte v. Barfield*, 898 S.W.2d 288, 293 & n.9 (Tex. 1995) (indicating that Article 8307c was recodified without substantive change).

We agree that the Texas Anti-Retaliation statute, which bars employers from firing employees in retaliation for submitting a worker's compensation claim, provides a useful point of reference. *See* Tex. Lab. Code Ann. § 451.001 (West 2006). Both the *Sabine Pilot* cause of action and the Anti-Retaliation statute carve out exceptions to the at-will-employment doctrine in cases of retaliatory discharge. *See Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 634 (Tex. 1995) (characterizing *Sabine Pilot* claim as "a cause of action for retaliatory discharge"). While the Anti-Retaliation statute is a legislative creation, the statute does not specify the damages available to successful claimants, leaving it to the courts to determine whether punitive damages may be awarded. *See Azar Nut Co. v. Caille*, 734 S.W.2d 667, 669 (Tex. 1987) (noting that Anti-Retaliation statute provides only for recovery of "reasonable damages suffered by employee as a result of the violation"). Accordingly, cases interpreting the Anti-Retaliation statute would "[l]ogically . . . serve as a guide" to the damages available under *Sabine Pilot*. 687 S.W.2d at 736 (Kilgarlin, J., concurring).

We turn, then, to supreme court decisions determining whether punitive damages may be awarded for violations of the Anti-Retaliation statute. At the time *Sabine Pilot* was decided, the supreme court had previously held that punitive damages were available under the Anti-Retaliation statute. *See id.* (citing *Carnation Co. v. Borner*, 610 S.W.2d 610 (Tex. 1980)). In subsequent decisions, the supreme court has maintained that position, explaining that punitive damages are "proper and necessary" to prevent employers from engaging in retaliatory discharge. *Azar Nut*, 734 S.W.2d at 669 (citation and quotation omitted). Noting that the purpose of the Anti-Retaliation statute is to deter employers from firing employees for engaging in a protected activity, the court has

12

stated that "the threat of punitive damages is inherently more likely to restrain bad faith employers from wrongfully terminating employees." *Id.* Further, the court has recognized that, "[i]n the absence of the deterrent effect of punitive damages, there would be little to dissuade an employer from engaging in the practice." *Id.* (quoting *Webb v. Dayton Tire & Rubber Co.*, 697 P.2d 519, 523 (Okla. 1985)).

This same logic applies to the *Sabine Pilot* cause of action. The threat of punitive damages is vital to achieving the purpose of the supreme court's *Sabine Pilot* exception, which is to "deter the violation of criminal laws" by prohibiting employers from firing employees for refusal to commit illegal acts. *See Ran Ken, Inc. v. Schlapper*, 963 S.W.2d 102, 106 (Tex. App.—Austin 1998, pet. denied). The need to deter this conduct is brought into sharp focus in a case such as this, where the actions of the employer not only violated the law but placed the safety of the employee and the public at risk. We consequently conclude that, as in cases brought under the Anti-Retaliation statute, the availability of punitive damages is "proper and necessary" in a *Sabine Pilot* cause of action. *See Azar Nut*, 734 S.W.2d at 669 (citation and quotation omitted).

Safeshred, however, argues that punitive damages are not available in this case because a *Sabine Pilot* cause of action sounds in contract, not tort, and punitive damages may not be recovered for breach of contract absent an independent tort. *See Lisanti v. Dixon*, 147 S.W.3d 638, 645 (Tex. App.—Dallas 2004, pet. denied) (citing *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex. 1981)).[21] However, "[r]etaliatory discharge has long been recognized as an action

---

[21] More specifically, Safeshred argues that the court in *Lisanti v. Dixon* concluded that *Sabine Pilot* claims sound in contract rather than tort. 147 S.W.3d 638 (Tex. App.—Dallas 2004, pet. denied). The *Lisanti* court, however, did not reach the issue. *Lisanti* also involved the question of whether an independent tort was required to support an award of punitive damages in a *Sabine*

sounding in tort." *Upton County v. Brown*, 960 S.W.2d 808, 816 (Tex. App.—El Paso 1997, no pet.) (analyzing Texas Whistleblower Act); *see also Almazan v. United Servs. Auto Ass'n*, 840 S.W.2d 776, 780 (Tex. App.—San Antonio 1992, writ denied) (explaining that for statute-of-limitations purposes claim under Anti-Retaliation statute "generally sounds in tort"); *Russell v. Edgewood Indep. Sch. Dist.*, 406 S.W.2d 249, 251 (Tex. Civ. App.—San Antonio 1966, writ ref'd n.r.e.) (indicating that action for termination because of union membership was action sounding in tort).

Further, we would expect attorney's fees to be available in a *Sabine Pilot* cause of action if such claims sounded in contract. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2008) (allowing recovery of attorney's fees when claim involves "an oral or written contract"). The only court to address the issue, however, has determined that attorney's fees are not available in *Sabine Pilot* cases. In *Garcia v. Sunbelt Rentals, Inc.*, the Fifth Circuit held that the prevailing party in a *Sabine Pilot* cause of action could not recover attorney's fees under the civil practice and remedies code. 310 F.3d 403, 404-05 (5th Cir. 2002). The court recognized that "no Texas court has held that an at-will employment relationship constitutes an oral contract warranting recoupment of fees." *Id.* at 404. Accordingly, the court's holding that attorney's fees cannot be recovered for a *Sabine Pilot* cause of action further indicates that the cause of action sounds in tort, and consequently supports an award of punitive damages.[22]

*Pilot* case. *Id.* at 645. Though the court noted that "Lisanti's argument focuses on his contention that [plaintiff's] *Sabine Pilot* claim is contractual in nature rather than a tort," the court went on to explain that "Lisanti fails to address . . . the fact that Dixon's petition included a claim for assault," which qualified as an independent tort. *Id.* Accordingly, the court decided the issue without resolving whether a *Sabine Pilot* claim sounded in tort or contract.

[22] Safeshred argues that, regardless of whether a *Sabine Pilot* claim sounds in tort or contract, two applicable Texas cases indicate that an independent tort must be proven in order to recover

14

As we conclude that an award of punitive damages is "proper and necessary" in a

*Sabine Pilot* cause of action, Safeshred's first issue on appeal is overruled.

### Malice

Safeshred next challenges the legal and factual sufficiency of the evidence supporting

the jury's finding of malice.[23]  In this case, the jury was instructed that it must find clear and

convincing evidence of malice before awarding exemplary damages.  The charge provided the

following definition of malice:

---

punitive damages in a retaliatory-discharge case.  *See Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282 (Tex. 1993); *Nagel Mfg. & Supply v. Ulloa*, 812 S.W.2d 78 (Tex. App.—Austin 1991, writ denied).  Both *Dutschmann* and *Nagel*, however, were sexual-harassment claims brought under a former version of the Texas Commission on Human Rights Act, under which the legislature specifically provided for the recovery of actual damages and equitable relief, but not punitive damages.  *See* former Tex. Rev. Civ. Stat. Ann. art. 5521K (Vernon 1987), *repealed by* Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 5(1), 1993 Tex. Gen. Laws 987, 1273; *see also Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 781 n.12 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (discussing *Dutschmann* and *Nagel*).  Accordingly, these cases do not bear on the issue of whether punitive damages are available under either the Anti-Retaliation statute or the *Sabine Pilot* public-policy exception.  *See id.* at 780-81 (describing argument that *Dutschmann* governed availability of punitive damages under Anti-Retaliation statute as "meritless").

[23]  The definition of malice submitted to the jury tracks neither the definition used in cases under the Anti-Retaliation statute, *see Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 452-54 (Tex. 1996) (requiring "actual malice" and defining it as "ill-will, spite, evil motive, or purposing the injuring of another"), nor the definition currently provided in the civil practice and remedies code, *see* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (West 2008) (identical to part (a) of definition given to jury but omitting part (b)).  Rather, the definition resembles the two-pronged version in place in the civil practice and remedies code from 1995 to 2003, with the first prong consisting of specific intent, and the second prong consisting of gross negligence.  *See Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.) (citing *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)).  However, since neither party objected to this instruction, we are bound to review the evidence in light of the definition actually given to the jury.  *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).

"Malice" means:

(a)     a specific intent by Donald Wallace or Kirk Tooley to cause substantial injury to Louis Martinez, III; or,

(b)     an act or omission by Donald Wallace or Kirk Tooley,

    (i)     which when viewed objectively from the standpoint of Donald Wallace or Kirk Tooley at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

    (ii)     of which Donald Wallace or Kirk Tooley has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

In conducting an evidentiary-sufficiency review under a clear-and-convincing standard of proof, we examine whether the jury could reasonably form a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under the legal-sufficiency inquiry, we look at all the evidence in the light most favorable to the finding and assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id.* Under the factual-sufficiency inquiry, we look at the evidence in light of the entire record. *Id.* Either direct or circumstantial evidence may be used to meet this evidentiary burden. *USA Truck, Inc. v. West*, 189 S.W.3d 904, 908 (Tex. App.—Texarkana 2006, pet. denied) (citing *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)).

We note at the outset that Safeshred does not contest the jury's finding that Martinez was fired for the sole reason of his refusal to commit an illegal act. Such evidence alone, however, is not enough to show malice; otherwise, malice under this standard would be present in every case

16

of wrongful discharge. *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 94 (Tex. App.—Austin 2005, no pet.) (citing *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 454 (Tex. 1996)). Under the charge given to the jury, Martinez must also show that Wallace and Tooley acted either (a) with the specific intent to cause him harm or (b) with conscious indifference regarding the violation of his legal rights. *Id.* (examining charge with identical wording).

We begin with an examination of conscious indifference under definition (b). In this case, Martinez testified that Wallace and Tooley asked him numerous times to drive vehicles or loads that they knew or had reason to know were unsafe or illegal.[24] Specifically, Martinez testified that the load he was supposed to drive on the day he was fired was secured with a faulty three-inch strap, a defect that had been pointed out in the DPS citation that Martinez had received on a prior trip and had shown to both Wallace and Tooley. Martinez testified that, on the day he was fired, he complained to Wallace and Tooley about safety issues involving the load, specifically mentioning the three-inch strap among other violations. Wallace and Tooley insisted that he drive the vehicle anyway, and Wallace fired him when he did not. The evidence at trial also showed that Tooley noted on Martinez's termination form that Martinez had "abandoned his job." Martinez testified, however, that he told Tooley that Wallace had fired him, and Tooley admitted in his own testimony that he had advised Wallace to fire Martinez immediately before Martinez was terminated.

---

[24] Though the testimony of Martinez, Wallace, and Tooley conflicted on a number of issues, a reasonable juror could resolve the conflicting testimony in favor of Martinez. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 560 (Tex. 1995) (explaining that jury is "the sole judge of the credibility of the witnesses and the weight to be given their testimony") (quotation and citation omitted).

This evidence would enable a reasonable juror to form a firm belief that Safeshred acted with conscious indifference to Martinez's legal rights when terminating his employment. Turning to the language of the charge, we conclude that the evidence would enable a reasonable juror to form a firm belief that Wallace and Tooley's firing of Martinez for failure to commit an illegal act objectively constituted an extreme risk to Martinez's legal rights. Further, the evidence would enable a reasonable juror to form a firm belief that Wallace and Tooley proceeded with conscious indifference to the risk to Martinez's legal rights. Martinez's testimony indicates that Wallace and Tooley each knew that the load Martinez was being asked to drive was illegal, and that they fired him despite possessing that knowledge. This evidence permits the inference that, in knowingly forcing Martinez "to choose between risking criminal liability or being discharged from his livelihood," *Winters*, 795 S.W.2d at 724, Wallace and Tooley acted with conscious indifference to the violation of Martinez's legal rights. *Ancira*, 178 S.W.3d at 94. Further, the jury could resolve the evidence to conclude that Tooley misrepresented the reason for Martinez's termination when indicating that Martinez had abandoned his job, a fact that further supports a finding of malice. *See Bennett v. Reynolds*, 242 S.W.3d 866, 895 (Tex. App.—Austin 2007, pet. granted) (noting that falsity and fabrication concerning relevant events may evince malice).

Accordingly, under definition (b) submitted to the jury, the evidence is legally sufficient for a juror to form a firm belief that Wallace and Tooley had objective and subjective knowledge that their actions involved an extreme degree of risk of violating Martinez's legal rights, yet proceeded with conscious indifference to that risk. Further, as the only competing evidence in the record derives from Wallace and Tooley's testimony—which the jury was entrusted with weighing—the evidence in light of the entire record is such that a fact-finder could reasonably form

18

a firm belief or conviction that its finding was true, satisfying the factual sufficiency prong of our analysis.[25] *See In re J.F.C.*, 96 S.W.3d at 266 (noting that distinction between legal and factual sufficiency when burden of proof is clear and convincing evidence "may be a fine one in some cases"). Safeshred's second issue on appeal is overruled.

### *Amount of Punitive Damages*

In its third issue on appeal, Safeshred argues that the amount of exemplary damages awarded in this case, $200,000, is excessive under the United States Constitution and Texas law.[26] Specifically, Safeshred argues that the award exceeds the substantive limitations imposed on an award of punitive damages by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and recognized under Texas law. U.S. Const. Amend. XIV, § 1; *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *Tony Gullo Motors, L.P. v. Chapa*, 212 S.W.3d 299, 307-08 (Tex. 2006).

---

[25] We further note that there is also significant evidence of malice under part (a) of the definition submitted to the jury, which involves "a specific intent by Donald Wallace or Kirk Tooley to cause substantial injury to Louis Martinez." The evidence presented by Martinez indicates a consistent pattern of behavior on the part of Wallace and Tooley in requesting or ordering him to perform illegal acts, culminating in Martinez's termination. Such a pattern of behavior may serve as evidence of a specific intent to cause harm to an employee. *Whole Foods*, 979 S.W.2d at 780. Further, Tooley's testimony that he found Martinez's voicing of safety concerns "obstinate" and "insubordinate," combined with the fact that Tooley both noted in company records and testified that Martinez had "abandoned his job" when all circumstances pointed towards the fact that Martinez had been fired, also constitute evidence of a specific intent to harm Martinez. *See Bennett v. Reynolds*, 242 S.W.3d 866, 895 (Tex. App.—Austin 2007, pet. granted) (noting that falsity and fabrication concerning relevant events may evince malice).

[26] The jury awarded punitive damages in the amount of $250,000, which was reformed by the trial court to an award of $200,000 to conform with the statutory cap under the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2009).

In determining whether a punitive-damages award is constitutionally permissible, the Supreme Court has identified three "guideposts" for courts to consider: (1) the nature or "reprehensibility" of the defendant's conduct; (2) the ratio between exemplary and compensatory damages; and (3) the size of civil penalties in comparable cases. *Campbell*, 538 U.S. at 418; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996); *Chapa*, 212 S.W.3d at 308.

*Degree of Reprehensibility*

The Supreme Court has stated that the first guidepost, the degree of reprehensibility of the defendant's conduct, is "the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. The Supreme Court has identified five factors in determining the degree of reprehensibility: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell*, 538 U.S. at 419. The existence of any one of the factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award, and the absence of all renders any award suspect. *Id.*

In this case, the first factor weighs in favor of Martinez, as Safeshred's conduct caused Martinez not only economic harm, but emotional and psychological harm as well. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008) (finding first factor met when plaintiff's relationships with his family suffered, he attended counseling after his termination,

20

and his termination made him feel hurt and upset). In this case, Martinez testified that Safeshred's conduct caused him a great deal of stress and also caused him to lose sleep.[27]

The second factor, which involves an indifference to or reckless disregard to the health or safety of others, also weighs in favor of Martinez. In this case, Wallace and Tooley acted with indifference to Martinez's safety when they conditioned his employment on driving a load they had reason to know was unsafe. The load's safety issues were later demonstrated in dramatic fashion when stacks of steel on the flatbed trailer that Martinez had been asked to haul came crashing loose through the rear window of the cab. This action could potentially have caused serious damage to Martinez. *See Campbell*, 538 U.S. at 424 (instructing reviewing court to consider reprehensibility in light of the harm potentially caused to plaintiff by defendant's acts).

The third factor inquires as to whether Martinez was financially vulnerable. The evidence demonstrates that he was. He earned $12 per hour while working as a driver at Safeshred, and this position was his only employment at the time. Further, Martinez testified that his termination put pressure on his fiancée to work harder in order to provide for the family's two children. Accordingly, this factor also weighs in favor of Martinez.

The fourth factor involves whether the action constituted a repeated pattern of behavior or an isolated incident, as "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an

---

[27] Although we reverse the jury's awards of damages for mental anguish *infra*, such a ruling does not bar us from considering non-economic harm in this analysis. *See United States EEOC v. W&O, Inc.*, 213 F.3d 600, 614 (11th Cir. 2000) (explaining that, "while the employees received [only] economic remedies, the harm was not necessarily purely economic," but also included violation of employees' civil rights and "infliction of worry and emotional upset").

21

argument that strong medicine is required to cure the defendant's disrespect for the law." *Gore*, 517 U.S. at 576-77. In this case, Safeshred several times asked Martinez to drive a load despite its being unsafe or illegal prior to the incident that led to his termination. Though Safeshred's prior conduct does not involve other incidents of firing employees for failure to perform illegal acts, "evidence of other acts need not be identical to have relevance in the calculation of punitive damages." *Campbell*, 538 U.S. at 423-24. Accordingly, this factor also weighs in favor of Martinez.

The fifth factor, involving whether the defendant's conduct was the result of intentional malice, trickery, or deceit, tracks our analysis of malice above. Martinez presented evidence that could reasonably lead to an inference that Safeshred acted with malice, including the termination form filled out by Tooley that indicates that Martinez was terminated because he "abandoned his job" and Tooley's testimony that he found Martinez's complaints regarding safety and compliance issues "obstinate" and "insubordinate." However, Wallace testified that he believed the load to be safe when he fired Martinez, and Tooley testified that he believed that Martinez had not been fired. Given the conflicting accounts, we determine that this final factor does not weigh strongly in favor of either party.

Accordingly, we conclude that four of the five factors in this case weigh in Martinez's favor, and thus the first guidepost supports the reasonableness of the punitive damages awarded by the jury.

*Ratio*

The second guidepost requires us to compare the disparity between the punitive damages award and the actual or potential harm suffered by Martinez. *Campbell*, 538 U.S. at 424.

Though the Supreme Court has held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," the Court has repeatedly declined to "impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 425. Indeed, the Court has recognized that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582.

In this case, the ratio of punitive to compensatory damages is 11 to 1 when compensatory damages for mental anguish and other non-economic losses are included, 26 to 1 when they are not. Though the ratios move past the single digits, they are based on a low award of compensatory damages for Safeshred's egregious conduct of repeatedly directing Martinez to break the law and endangering his personal safety. *See Campbell*, 538 U.S. at 424 (considering harm potentially caused to plaintiff). Further, we note that the *Sabine Pilot* exception is based on the public-policy interest in deterring employers from firing employees for refusing to break the law, a particular concern when the laws involve the safety of employees and the public at large. *See Ran Ken*, 963 S.W.2d at 106; *see also Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1338-39 (11th Cir. 1999) (upholding ratio of 100 to 1 and noting the state's strong interest in deterring the corporate defendant's conduct of environmental pollution). Consequently, we conclude that this guidepost does not undercut the reasonableness of the jury's award.

*Comparable Penalties*

Under the third guidepost, we compare the punitive damages amount to the civil penalties that could have been imposed for comparable misconduct. The parties agree that there are

23

no directly comparable penalties for wrongful termination. When no comparable penalties exist, numerous federal courts have looked to whether the punitive damages awarded comport with statutory caps on damages, as damage caps "represent[] a legislative judgment similar to the imposition of a civil fine." *Zhang v. American Gem Seafoods*, Inc., 339 F.3d 1020, 1045 (9th Cir. 2003); *see also EEOC v. Federal Express Corp.*, 513 F.3d 360, 378 (4th Cir. 2008); *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000).

In this case, the jury awarded $250,000 in punitive damages. The trial court reformed the award to $200,000, equaling the maximum amount of statutory damages allowed in this case under the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West Supp. 2009). Numerous federal courts have held that "a punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated." *Romano*, 233 F.3d at 673; *see also Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1245 (10th Cir. 1999) (rejecting contention that award of maximum damages allowable under statutory cap is excessive). Accordingly, as the amount of punitive damages comports with the statutory cap, the third guidepost favors Martinez.

After reviewing the three guideposts, we conclude the jury's award of punitive damages does not violate Safeshred's due process rights. Further, as we note in our analysis of the third prong that the award is within the statutory range of damages available under Texas law, *see* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b), we conclude that the jury's award is permissible under Texas law. Accordingly, Safeshred's third issue on appeal is overruled.

24

***Compensatory Damages***

In its fourth and fifth issues on appeal, Safeshred argues that compensatory damages for mental anguish and related emotional losses are not available under a *Sabine Pilot* cause of action and that, even if available, the evidence is legally and factually insufficient to support the jury's award of compensatory damages for mental anguish. We first address Safeshred's fifth issue, legal and factual sufficiency.

An award of compensatory damages for mental anguish will survive a legal sufficiency challenge if the record contains direct evidence of the nature, duration, and severity of the plaintiff's mental anguish, thus establishing a substantial disruption in the plaintiff's routine. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). If claimants fail to present direct evidence of the nature, duration, and severity of their anguish, the appellate court conducts a traditional no-evidence review. *Id.* In this review, the court determines whether the record contains any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Id.* We note, however, that "the absence of [evidence of the nature, duration, and severity of mental anguish], particularly when it can be readily supplied or procured by the plaintiff, justifies close judicial scrutiny of other evidence offered on this element of damages." *Id.*

In this case, Martinez presented evidence that the ordeal was "very stressful" and caused him to lose "a lot" of sleep. However, he did not present direct evidence of the precise duration or severity of the mental anguish he suffered.

Accordingly, we examine the record under a traditional no-evidence analysis for other proof of a high degree of mental pain and distress that is more than mere worry. *Woodruff*, 901 S.W.2d at 444. A plaintiff may recover for mental anguish after providing evidence of "a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair or public humiliation or a combination of any of these." *Wal-Mart Stores v. Odem*, 929 S.W.2d 513, 528 (Tex. App.—San Antonio 1996, writ denied). However, evidence that a plaintiff "was unable to sleep, was depressed, and suffered from anxiety . . . does not rise to the level of compensable mental anguish under Texas law." *Lefton v. Griffith*, 136 S.W.3d 271, 279 (Tex. App.—San Antonio 2004, no pet.) (citation and quotations omitted); *see also Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (explaining that, though plaintiff's concerns were both "real" and "understandable," they were not compensable under Texas law).

In this case, Martinez presented evidence that he experienced sleeplessness, stress, and anxiety due to hauling illegal loads, being fired, and being forced to search for another job. Although such emotions were certainly real and understandable under the circumstances, as in *Lefton*, this evidence does not rise to the level of compensable mental anguish. 136 S.W.3d at 279. Accordingly, we uphold Safeshred's fifth issue on appeal and reverse the award of damages for mental anguish.[28]

---

[28] As we reverse the mental-anguish award on evidentiary sufficiency grounds under Safeshred's fifth issue on appeal, we do not address Safeshred's fourth issue on appeal, which asserts that damages for mental anguish are not available in a *Sabine Pilot* cause of action. We note, however, that Safeshred's briefing on this issue centers on the contention that a *Sabine Pilot* action sounds in contract, an argument we rejected in deciding Safeshred's first issue on appeal.

## CONCLUSION

We affirm the judgment of the trial court awarding $7,569.18 in economic damages and $200,000 in exemplary damages. We reverse the judgment of the trial court awarding $10,000 in compensatory damages for non-economic losses, including mental anguish, and render judgment that Martinez take nothing in non-economic compensatory damages.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson;
   Concurring and Dissenting Opinion by Justice Puryear

Affirmed in part; Reversed and Rendered in part

Filed: April 23, 2010