In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00269-CV**
_____

**PSALMS FUNERAL HOME LLC, Appellant**

**V.**

**AQILLA HOGAN-ROGERS, Appellee**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-07-08613-CV**

**MEMORANDUM OPINION**

Appellant Psalms Funeral Home LLC ("Psalms") argues that the evidence is legally insufficient to support the trial court's finding that Psalms breached a contract with appellee Aqilla Hogan-Rogers ("Hogan-Rogers"), because she was not a party to the contract, which was signed by her husband, who was not a named party in the lawsuit. Psalms also argues that the trial court abused its discretion by awarding damages for emotional distress and treble damages pursuant to the Texas Deceptive Trade Practices Act ("DTPA"), because the evidence is legally insufficient to

1

support a finding of intentional infliction of emotional distress and a finding that Psalms knowingly or intentionally violated the DTPA. We affirm the trial court's judgment.

## Background

In July 2017, Hogan-Rogers filed suit against Psalms, alleging causes of action for breach of contract, common-law fraud, violation of the DTPA, intentional infliction of emotional distress, and negligence. Hogan-Rogers alleged that she contracted with Psalms to bury her newborn daughter, A.R., and that Psalms breached the contract by embalming A.R. and burying A.R. in a "food cooler wrapped closed with duct tape, instead of a child's casket." Hogan-Rogers alleged that Psalms committed common-law fraud by leading her to believe that A.R. would be buried in a traditional casket, and that Psalms violated the DTPA by failing to disclose that it intended to bury A.R. in a cooler. According to Hogan-Rogers, she was entitled to recover mental anguish damages because Psalms acted knowingly when it represented that A.R. would be buried in a casket. Hogan-Rogers further alleged that Psalms's conduct in disregarding her explicit requests regarding A.R.'s burial was "reckless, if not intentional[,]" and Psalms's conduct was extreme and outrageous, causing her severe emotional distress. Hogan-Rogers also alleged that Psalms negligently embalmed A.R. despite her specific instruction not to do so.

2

Psalms filed a general denial, affirmative defenses, and a motion for special exceptions claiming that Hogan-Rogers failed to specify those acts or omissions that Psalms allegedly committed that would support an award of exemplary damages. Psalms also filed a counterclaim, alleging that it had suffered damages and incurred attorney's fees as a direct and proximate result of the occurrence made the basis of the lawsuit. Hogan-Rogers filed a general denial and affirmative defenses to Psalms's counterclaim.

The trial court conducted a bench trial, during which Hogan-Rogers testified that on January 14, 2016, she gave birth to A.R., who lived less than fifteen hours. Hogan-Rogers testified that her husband, Brandon Rogers, was A.R.'s father, and she explained that in 2015, they had lost a son, who was stillborn. According to Hogan-Rogers, her mother-in-law, Carolyn Rogers, contacted Psalms the day A.R. passed away, and Hogan-Rogers, Brandon, and Carolyn went to Psalms the following day and spoke with William McLean, who told them that they could not see A.R. because Alice Harper had embalmed A.R. the night of January 14. Hogan-Rogers explained that when she spoke with Alice Harper on January 14, she requested that A.R. not be embalmed, and the record contains a document indicating that the family refused embalming. According to Hogan-Rogers, after she told McLean that A.R. was not supposed to be embalmed, McLean added language to the contract stating that the reason for embalming was for "viewing purposes[.]"

Hogan-Rogers testified that on January 15, she discussed the funeral service with McLean, and Brandon filled out and signed a contract with McLean. Hogan-Rogers testified that the contract indicates that a casket would be provided, and the record contains the funeral purchase agreement which shows that the merchandise included a casket. According to Hogan-Rogers, McLean did not provide them with a catalog of caskets to choose from and he did not know what color the casket would be, but she expected the casket to be a regular infant casket. Hogan-Rogers testified that Harper never told her that she was going to build the casket. Hogan-Rogers explained that Harper told her that the funeral would cost $500, and that is how much was paid.

Hogan-Rogers testified that the next contact with Psalms was on January 17, the day of A.R.'s graveside burial. Hogan-Rogers testified that when she went to A.R.'s burial site, she expected to see a casket, but she saw a Styrofoam box with duct tape. Hogan-Rogers explained that she "just stood there, kind of . . . blacked out[,]" and felt like she "was in a twilight zone[.]" The record includes a picture of the box with duct tape that Hogan-Rogers took at the funeral, and she testified that she took the picture because she "couldn't believe it." Hogan-Rogers described the "contraption[]" as covered with pink material that was "duct tape wrapped around a Styrofoam Igloo cooler." Hogan-Rogers testified that it was horrible and disgusting,

4

and she did not think that Psalms acted in a professional manner. According to Hogan-Rogers, Psalms acted recklessly and its conduct was outrageous.

Hogan-Rogers testified that for several months she has had trouble sleeping, nightmares of A.R. being dug up by animals, and deep depression, and she attempted suicide twice. Hogan-Rogers testified that the grave was very shallow, and she had seen animals buried in better conditions. Hogan-Rogers explained that she was traumatized and it took about a year of being on medication for her to stabilize and be able to work and provide for her family. According to Hogan-Rogers, she was in a weakened state for "a good while[]" and her condition affected her family relationships.

Brandon testified that he signed the contract with Psalms and understood that the services he contracted for included a casket, and he expected the casket to be similar to the one in which his son was buried. According to Brandon, he was shocked when he saw that A.R. was not buried in a casket, but in something that was covered in pink fabric and secured with duct tape. Brandon also testified that the funeral service was not professional and the manner in which A.R. was buried was extreme and outrageous. According to Brandon, if he had known Psalms intended to bury A.R. in a Styrofoam box, he would have gone to another funeral home. Brandon testified that after A.R.'s burial, Hogan-Rogers became very depressed and distraught and began taking medication.

5

Carolyn testified that she was at the hospital when she first spoke with Harper on the telephone about A.R.'s funeral, and Carolyn told Harper that they did not want A.R. to be embalmed. Carolyn explained that the following day, they met McLean at Psalms, and McLean did not tell her that Psalms intended to build the casket. According to Carolyn, she would not have done business with Psalms had she known that Harper intended to build the casket out of a Styrofoam box. Carolyn testified that she paid Psalms $500 for the funeral, and Hogan-Rogers and Brandon reimbursed her. Carolyn explained that after the funeral, Hogan-Rogers needed a lot of help and support.

Harper testified that Psalms has been in the funeral home business since 1989. Harper agreed that A.R. was buried in a Styrofoam enclosure that she prepared, and that, depending on the size of the baby, she "always do[es] my babies that way." Harper explained that she had duct tape on the casket in case the family wanted to see A.R. According to Harper, it is not her practice to state in the contract her intention to build the casket. Harper explained that she has made thirty or forty caskets, and she makes her caskets the same way the manufacturers do. According to Harper, she has never received a complaint about her caskets.

Harper testified that neither she nor McLean ever disclosed that she was going to build a casket or that A.R. was going to be buried in a Styrofoam enclosure. Harper further testified that McLean did not tell the family that Psalms would get a casket

6

from its other location. Harper also testified that she did not embalm A.R. Harper explained that she dug the hole for the casket, because the family did not have the money for a gravedigger. According to Harper, she did not make any money from A.R.'s funeral, and she was just trying to give A.R. a decent burial. Harper testified that she was shocked by the lawsuit, because she did not do anything wrong.

McLean testified that he has been employed with Psalms for fifteen years, and McLean explained that he went over the funeral contract with Brandon. According to McLean, he did not tell Brandon, Hogan-Rogers, or Carolyn that the casket was going to be made from a Styrofoam box; he just told them that a casket would be provided. McLean testified that A.R. was not embalmed, and he never told Brandon that A.R. had been embalmed. McLean explained that the contract lists the price of embalming but does not indicate that A.R. was embalmed. McLean testified that A.R.'s service was nice and that Hogan-Rogers thanked Psalms after the service.

The trial court found that there was sufficient evidence to support Hogan-Rogers's claims for breach of contract, intentional infliction of emotional distress, and violation of the DTPA in the form of nondisclosure. The trial court awarded Hogan-Rogers $500 in actual damages for breach of contract, $45,000 in compensatory damages for emotional distress and mental anguish, and $90,000 for knowingly and intentionally violating the DTPA. The trial court also ordered that Psalms would take nothing on its counterclaims.

The trial court issued findings of fact and conclusions of law. The trial court found, among other things, that a contract existed between Hogan-Rogers and Psalms, which Hogan-Rogers performed by paying for the contract and which Psalms breached by not providing a casket as promised; Psalms acted intentionally, or at least recklessly, in its manner of A.R.'s burial, and Psalms's conduct was extreme, outrageous, and the cause of Hogan-Rogers's severe emotional distress; and that Hogan-Rogers was a consumer and Psalms failed to disclose information concerning the goods (casket) and services (manner of burial) which it knew when it contracted with Hogan-Rogers, intending to induce Hogan-Rogers into a transaction into which she would not have entered had the concealed information been disclosed.

Analysis

In issue one, Psalms argues that the evidence is legally insufficient to support the trial court's finding that Psalms breached a contract with Hogan-Rogers because she was not a party to the contract, which was signed by her husband, who was not a named party in the lawsuit. Hogan-Rogers argues that because Psalms failed to raise this challenge before trial, it has waived this issue for appellate review.

"[A] challenge to a party's privity of contract is a challenge to capacity, not standing, and requires compliance with [R]ule 93 of the Texas Rules of Civil Procedure." *John C. Flood of DC, Inc. v. SuperMedia, L.L.C.*, 408 S.W.3d 645, 651

8

(Tex. App.—Dallas 2013, pet. denied); *see also* Tex. R. Civ. P. 93(1) (providing that a pleading challenging a plaintiff's legal capacity to sue shall be verified by affidavit). Based on our review of the record, Psalms did not challenge Hogan-Rogers's capacity in its pleadings. Psalms first mentioned this argument in its proposed amended findings of fact and conclusions of law, which Psalms filed seven days after trial. We conclude that because Psalms failed to challenge Hogan-Rogers's capacity to sue in a verified pleading prior to trial, Psalms has waived this issue for our review. *See Nine Greenway Ltd. v. Heard, Goggan, Blair & Williams*, 875 S.W.2d 784, 787 (Tex. App.—Houston [1st Dist.] 1994, writ denied). We overrule issue one.

In issues two and three, Psalms argues that the trial court abused its discretion by awarding damages for emotional distress and treble damages pursuant to the DTPA, because the evidence is legally insufficient to support a finding of intentional infliction of emotional distress and a finding that Psalms knowingly or intentionally violated the DTPA. Findings of fact are reviewable for legal or factual sufficiency under the same standards applied to a jury's answers. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When a party attacks the legal sufficiency of an adverse finding on which the party did not have the burden of proof, the party must demonstrate on

9

appeal that no evidence supports the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014).

Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The factfinder is the sole judge of the credibility of the witnesses and is responsible for resolving any conflicts in the evidence, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Id.* at 819-21; *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). When evaluating legal sufficiency, we review the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it, and when there is conflicting evidence, we presume the factfinder resolved the conflicting evidence in favor of the prevailing party and disregard that evidence in our review. *City of Keller*, 168 S.W.3d at 810, 820-21. We credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. A trial court abuses its discretion if it acts arbitrarily, without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The mere fact that a trial court may decide an issue within its discretionary authority in a manner different than what an appellate judge would decide in a similar circumstance does not demonstrate that the trial court has abused its discretion. *Sw. Bell Tel. Co. v. Johnson*, 389 S.W.2d 645, 648 (Tex. 1965).

Psalms contends that the evidence is legally insufficient to support a finding that its conduct was extreme and outrageous and that it intentionally caused Hogan-Rogers emotional distress. While Psalms also complains that Hogan-Rogers failed to produce evidence that she had been treated for emotional distress, Psalms has failed to cite to any caselaw requiring the admission of medical records or medical bills to support damages for intentional infliction of emotional distress. *See Higginbotham v. Allwaste, Inc.*, 889 S.W.2d 411, 417 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (providing that proof of visiting a doctor is not the only or exclusive method of proving severe emotional distress). The trial court found, among other things, that Psalms acted intentionally in its manner of A.R.'s burial, that conduct being extreme, outrageous, and the cause of Hogan-Rogers's severe emotional distress. The trial court awarded Hogan-Rogers $45,000 for emotional distress and mental anguish.

A cause of action for intentional infliction of emotional distress has four elements: (1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe. *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017). For conduct to be extreme and outrageous, it must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"

11

*GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999) (quoting *Natividad Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994)). Emotional distress includes highly unpleasant mental reactions such as embarrassment, horror, grief, and worry, and severe emotional distress is distress that is so severe that no reasonable person could be expected to endure it. *Id.* at 618. A finding of intentional infliction of emotional distress can be upheld when a plaintiff has become so worried that she considers taking her own life. *Gaspard v. Beadle*, 36 S.W.3d 229, 238 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

Intentional infliction of emotional distress requires that the actor either intend to cause severe emotional distress or that severe emotional distress is the primary risk created by the actor's reckless conduct. *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 63 (Tex. 1998). "Intentional conduct requires a showing that the actor desired the consequences of her act." *Behringer v. Behringer*, 884 S.W.2d 839, 842 (Tex. App.—Fort Worth 1994, writ denied). An actor is reckless when she knows or has reason to know of facts that create a high degree of risk of harm to another and deliberately proceeds to act in conscious disregard of, or indifference to, that risk. *Clayton v. Wisener*, 190 S.W.3d 685, 695 (Tex. App.—Tyler 2005, pet. denied). Intent may be inferred from the circumstances and the defendant's conduct, and a factfinder is free to discredit the defendant's protestations that no harm was intended and to draw necessary inferences to establish intent. *Id.*

12

The trial court heard testimony that as a result of A.R. being buried in a Styrofoam cooler with duct tape, Hogan-Rogers experienced emotional problems for several months, including deep depression, trouble sleeping, nightmares of A.R. being dug up by animals, and that Hogan-Rogers had attempted suicide twice. The trial court heard that Hogan-Rogers was traumatized and that it took approximately a year of being on medication for her to stabilize and be able to work. The trial record included a photograph that Hogan-Rogers took at the funeral and she described the "contraption" that A.R. was buried in as being covered with pink material that was "duct tape wrapped around a Styrofoam Igloo cooler." The trial court heard testimony that the manner in which Psalms buried A.R. was extreme and outrageous, and that Hogan-Rogers felt like she "was in a twilight zone" when she saw A.R.'s burial site. The trial court also heard Harper testify that she had always intended to bury A.R. in a Styrofoam enclosure that she would build, which she did not disclose to Hogan-Rogers, and that the duct tape was necessary to "hold the bottom part to keep it from falling off."

The trial court also heard testimony that the contract provided that the funeral service included a casket, but it was not Psalms's practice to state that Harper would build the casket. The trial court considered testimony that Harper dug the grave, which was described as very shallow, and the trial court found that the photograph of the cooler in the grave was so unlike a usual burial site that Psalms's attorney

13

accused Hogan-Rogers of digging up the cooler to take the photograph. The trial court's findings indicated that it believed the testimony that McLean told the family that A.R. had been embalmed, which the trial court found to be both highly alarming and highly relevant as to the intentional conduct causing mental anguish and emotional distress in this case.

After crediting all the favorable evidence a reasonable factfinder could, and disregarding all contrary evidence unless a reasonable factfinder could not, we conclude that the evidence would enable a reasonable and fair-minded person to conclude that Psalms acted intentionally or at least recklessly in its manner of A.R.'s burial; its conduct was extreme and outrageous; and there is legally sufficient evidence proving that its conduct caused Hogan-Rogers severe emotional distress. *See Hersh*, 526 S.W.3d at 468; *City of Keller*, 168 S.W.3d at 827; *Bruce*, 998 S.W.2d at 618; *Johnson*, 985 S.W.2d at 63; *Gaspard*, 36 S.W.3d at 238. Accordingly, because the evidence is legally sufficient to support a finding of intentional infliction of emotional distress, we conclude that the trial court did not abuse its discretion by awarding Hogan-Rogers damages for emotional distress. *See Downer*, 701 S.W.2d at 241-42. We overrule issue two.

In issue three, Psalms argues that the trial court abused its discretion by awarding treble damages pursuant to the DTPA because the evidence is legally insufficient to support a finding that Psalms knowingly or intentionally violated the

14

DTPA. Our review of Psalms's brief shows that the briefing on this issue contains no citations to any legal authority. *See* Tex. R. App. P. 38.1(i) Because Psalms's brief fails to provide appropriate citations to authorities in support of its argument, we overrule Psalms's third issue as inadequately briefed. *See id.* Having overruled each of Psalms's issues, we affirm the trial court's judgment.

      AFFIRMED.

_____<br>
STEVE McKEITHEN<br>
Chief Justice

Submitted on August 5, 2020<br>
Opinion Delivered December 30, 2020

Before McKeithen, C.J., Horton and Johnson, J.J.